Argued and submitted January 15, affirmed May 18, reconsideration denied August 5, petition for review denied August 30, 1988 (306 Or 528)

## STATE OF OREGON,
*Respondent,*

*v.*

## BILLY RAY McARDLE,
*Appellant.*

(86-10-08862; CA A43697 (Control))

## STATE OF OREGON,
*Respondent,*

*v.*

## CINDY RAE HARRELSON,
*Appellant.*

(10-86-08855; CA A44420)
(Cases Consolidated)

754 P2d 918

Diane L. Alessi, Deputy Public Defender, Salem, argued the cause for appellants. With her on the brief was Gary D. Babcock, Public Defender, Salem.

Frank Gruber, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

## ROSSMAN, J.

Defendants and several others were charged with conspiracy to manufacture methamphetamine. Defendants appeal from a denial of their motions to dismiss their indictments on the ground that the government's conduct was so outrageous that prosecuting them violated their federal due process rights. We affirm.

Because analysis of a due process claim for outrageous government conduct is fact-oriented, we set the facts out in detail.[1] In July, 1986, officers Salsbery, Severns and Koyto began an undercover drug investigation, stationing themselves in a motel in Harrisburg. Salsbery and Koyto testified that their first encounter with any of the alleged co-conspirators occurred at the motel, on September 29, when a contact introduced Lybarger[2] as a person from whom the officers could purchase larger quantities of methamphetamine. Lybarger told the officers that he could get an ounce of methamphetamine for about $1100. The officers testified that he sold them one-half ounce of methamphetamine for $600 the following day and varying quantities of marijuana as well as methamphetamine on several other occasions.

Severns testified that the officers had reason to believe, before actually meeting Lybarger, that he was involved in manufacturing methamphetamine. On September 25, another contact told them that she knew of someone who was manufacturing methamphetamine in his residence and had 10 pounds that he was trying to sell. An agent followed her as she went to make a purchase from that source, whom the

---

[1] We rely on a trial court's findings, unless they are clearly erroneous. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968). Although the trial court declined to make specific findings of fact here, *see State v. Wise,* 305 Or 78, n 2, 749 P2d 1179 (1988), it did conclude

"that all of the affiants whose affidavits have been filed in connection with these motions and all of the witnesses whose testimony has been taken in connection with these motions have spoken the truth, and that any conflicts in such affidavits and such testimony are immaterial and need not be resolved for the purposes of ruling upon these motions;

"NOW, THEREFORE, IT IS ORDERED that the defendants' motions to dismiss the indictments are denied."

[2] Lybarger was a co-defendant at the consolidated hearing on the motions to dismiss on the ground of outrageous government conduct; he appeals separately on the same grounds. *State v. Lybarger,* 91 Or App 316, 754 P2d 923 (1988).

agent later identified as Lybarger. According to Koyto's testimony, Lybarger later told him that he had made that sale and that "that day we were making dope and that was my dope that we made."

Salsbery testified that manufacturing methamphetamine was first discussed on October 6, when Lybarger and his girlfriend, defendant Harrelson, came to the motel and asked the officers to "field-test" a quarter gram packet of methamphetamine, which the officers had done before. It tested positive as methamphetamine. When Lybarger asked where the test kits came from, the officers told him that they had a chemist friend in Portland who provided the kits and could provide any chemicals that they wanted. Who, if anyone, directly proposed setting up a methamphetamine lab is disputed. However, it is clear that an agreement was made to do so and to split the proceeds 50-50, with the officers supplying chemicals and equipment and Lybarger supplying the site, expertise and a cook.

Salsbery and Koyto testified that, during the same meeting, Lybarger told them that he had had two labs, one of which, at least, had recently blown up, one in a motel in Eugene and the other in his residence. Koyto also testified that earlier, on October 1, Lybarger had shown him the room in his house where the lab had blown up. Koyto said that he smelled the distinct odor of phenyl-2-propane (P2P), an essential element for manufacturing methamphetamine, and saw spatter marks on the wall, which Lybarger identified as "dope from an explosion." That explosion apparently forced Lybarger out of business.

On October 16, Lybarger introduced the officers to defendant McArdle and Harrelson at his residence. McArdle was to be the cook. Salsbery and Koyto testified that McArdle said that he understood that they were interested in making a methamphetamine lab and splitting the proceeds 50-50. McArdle asked if they had received a list of necessary chemicals and supplies which he had given Lybarger two days earlier. They responded that they had and would be able to get some of the chemicals. McArdle assured them that he had operated three or four methamphetamine labs in the past and proposed using a particular site in Dexter in a small camp trailer. McArdle indicated that he had some supplies there and

was ready to cook when the chemicals and additional supplies were available. He also requested money to pay a couple of "Okies" with guns to provide security. The officers did not hear from the defendants for several days after that meeting.

On October 20, the officers contacted defendants and arranged a meeting at a motel in Eugene for later that night. McArdle again told the officers that he was ready to cook and asked if they had the chemicals. They told him that they did not have all the chemicals yet but that they did have 25 pounds of phenyl acetic acid (PA). McArdle told the officers that he would need 8 pounds of PA to make enough P2P to yield 4 pounds of methamphetamine. He also said that he could sell or trade a couple of pounds for additional chemicals or glassware. About 10 pounds of PA were given to McArdle at that meeting.

The next meeting with Lybarger and McArdle took place on October 22 at Koyto's apartment in Harrisburg. McArdle brought a suitcase containing several pieces of glassware and a small flask, which he said that he had bought with the two extra pounds of PA that the officers had given him. He again told the officers that he was ready to cook. Severns testified that he expressed concern about safety at the Dexter site and the use of guns. McArdle proposed changing the location to the residence of Caress in Eugene. He told them that he had already checked with Caress and that he wanted $100 for the use of his place. The officers gave McArdle the $100 to pay Caress.

Plans were then made to go to the residence. The officers agreed to transport the chemicals. Neither defendants nor Lybarger had a car. McArdle told the officers that he needed chloroform, alcohol, tinfoil, Pyrex plates and several other items. Salsbery and Severns bought the chloroform and alcohol, while Koyto took Lybarger, McArdle and Harrelson with him to purchase the other items. Koyto also took McArdle to the trailer in Dexter, where he retrieved several items for the lab. The parties reconvened at the Caress house, where they unloaded the items for the lab into the garage.

Salsbery testified that Lybarger also told the officers that he needed to buy more lead acetate and asked them for money. Salsbery gave Koyto $50, and Koyto and Lybarger

bought lead acetate and a reducer. Severns bought more tinfoil, paper towels and other items. In the meantime, McArdle and Harrelson began setting up the lab, and McArdle told Salsbery that he had once cooked $3000 worth of chemicals for a man who netted $100,000 from the finished product. He also told Salsbery that it would take 8 to 10 hours to do the reaction for P2P.

The officers told defendants that they would wait at their Harrisburg apartment until the first stage of production was complete, at which time defendants were to call and they would bring the rest of the chemicals to make the finished product. When the officers left the lab site, they obtained a search warrant which ultimately led to the challenged indictments.

■    Defendants contend that the officers' participation in the crime—i.e., arguably, instigating the enterprise and supplying the necessary chemicals, equipment and transportation—constitutes extreme and outrageous conduct in violation of their due process rights under the 14th Amendment. Defendants argue that, without the officers' involvement, no crime would have been committed.[3]

■    A criminal indictment may be dismissed when government conduct is so outrageous that it violates due process. *United States v. Russell,* 411 US 423, 431-32, 93 S Ct 1637, 36 L Ed 2d 366 (1973); *United States v. Bogart,* 783 F2d 1428, 1431-32 (9th Cir 1986). A determination whether particular government behavior contravenes constitutional due process is a question of law. *United States v. Bogart, supra,* 783 F2d at 1431; *United States v. Ramirez,* 710 F2d 535, 539 (9th Cir 1983).

■■   An outrageous government conduct claim is a close

---

[3] Defendants also assert a claim under Art. 1, § 10, of the Oregon Constitution, which states:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

Defendants fail to demonstrate, however, how their theory fits under that language. The "due course of law" language recognizes a civil plaintiff's right to a remedy for injuries that existed at common law; it is not a basis for the claim which defendants seek to assert here. *See State v. Hart,* 299 Or 128, 140, 699 P2d 1113 (1985).

relative of the entrapment defense, but it focuses on the objective impropriety of the government's behavior rather than on the defendant's predisposition to commit the crime. *United States v. Bogart, supra,* 783 F2d at 1433. In *Hampton v. United States,* 425 US 484, 96 S Ct 1646, 48 L Ed 2d 113 (1976), a majority of a divided court recognized the potential availability of an outrageous police conduct defense no matter what the defendant's criminal predisposition. To violate due process the government's conduct must be "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Ryan,* 548 F2d 782, 789 (9th Cir 1976). The outrageous government conduct defense has been restricted to extreme cases. It "must be predicated on intolerable government conduct which goes beyond that necessary to sustain an entrapment defense." *United States v. Jannotti,* 673 F2d 578, 607, (3d Cir 1982) (en banc), *cert den* 457 US 1106 (1982).[4] In essence, the due process argument has only been successful where the government essentially manufactured the crime. *United States v. Bogart, supra,* 783 F2d at 1436-37 (discussing *Greene v. United States,* 454 F2d 783 (9th Cir 1971); *United States v. Twigg,* 588 F2d 373 (3d Cir 1978); *United States v. Batres-Santolino,* 521 F Supp 744 (ND Cal 1981)).

Defendants rely primarily on *Greene* and *Twigg.* In *Greene,* the court reversed conspiracy and bootlegging convictions when government undercover agents had helped to reestablish and then sustain over a two-year period bootlegging operations that had been shut down by prior criminal convictions. The government agent in *Greene* offered to supply materials, an operator and a location for the still and supplied sugar at wholesale prices. Moreover, the agent was the sole purchaser of the still's entire output. The *Greene* court held that, although none of those facts alone necessarily would have required reversal, the combination violated due process.

The indictment was dismissed in *Twigg* where a government informant contacted an old acquaintance to discuss setting up a methamphetamine lab, provided the location and all the necessary chemicals (partly through a fictional business) as well as about 20 percent of the glassware. Moreover,

---

[4] The Supreme Court has never reversed a criminal conviction on this ground, and only two federal circuit courts have dismissed an indictment in response to it. *See U.S. v. Bogart, supra,* 783 F2d at 1434.

the informant was in complete control of the lab. The defendant's assistance was minimal and at the specific direction of the informant. The court held:

> "This egregious conduct on the part of government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs." 588 F2d at 381.

That is not the case here. The defendants in *Twigg* contributed nothing in terms of expertise, money, supplies or ideas, in contrast to the present defendants, who provided a list of the necessary chemicals and equipment and the lab site, as well as the expertise. Salsbery, Severns and Koyto were not in complete control of the lab; their role was more that of suppliers. The officers did not coerce defendants to begin or to continue their involvement in the crime. Although the officers participated in the crime, they did not, unlike those in *Twigg* and *Greene,* create, out of whole cloth, criminal enterprises which otherwise would not exist, solely for the purpose of charging someone with their commission. *United States v. Bogart, supra,* 783 F2d at 1436.

The government behavior in this case is more akin to that in *United States v. Russell, supra,* 411 US 423, and *United States v. Smith,* 538 F2d 1359 (9th Cir 1976). In *Russell,* a government agent suggested that he supply P2P in return for half of the drugs produced and was present during production but did not direct or participate, except to pick up some foil pieces that had fallen on the floor and put them in a flask. The Supreme Court held that the police participation did not violate due process. The Court noted that infiltration of drug rings and limited participation in their unlawful practices was a recognized permissible means of investigation. In *Smith,* the court affirmed defendant's conviction, holding that the following government conduct was similar to that in *Russell.* An informant provided 100 grams of mercuric chloride, some glass tubing and $750 and helped transport some P2P. The informant participated in setting up and operating a methamphetamine lab at the direction of the defendant, who provided the formula. Under the initial agreement, the defendant was to be in charge of manufacturing the drug and the informant's role was to press tablets containing methamphetamine.

■ Defendants argue that they were not operating a methamphetamine lab when they met the officers. The facts indicate, however, that the only reason why defendants and Lybarger were not operating a lab was that their lab had recently exploded. Government agents may approach people who are involved in a continuing series of similar crimes or are contemplating criminal activity, as well as when the charged criminal enterprise is already in progress. *U.S. v. Emmert,* 829 F2d 805, 812 (9th Cir 1987); *United States v. Bogart, supra,* 783 F2d at 1437; *United States v. O'Connor,* 737 F2d 814, 817-18 (9th Cir 1984), *cert den* 469 US 1218 (1985). Even if, as defendants contend, they were not actively engaged in manufacturing methamphetamine when the officers came on the scene, the record shows that they were looking for an opportunity to set up another lab and that the officers did not force or lure them into anything.

We hold that the officers' conduct was not "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Ryan, supra,* 548 F2d at 789.

Affirmed.