No. 94-240

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

STATE OF MONTANA,

    Plaintiff and Respondent,

v.

RONDA K. WILLIAMS-RUSCH,

    Defendant and Appellant.

FILED

NOV 25 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Nineteenth Judicial District,
In and for the County of Lincoln,
The Honorable Robert S. Keller, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Amy N. Guth, Public Defender's Office, Libby,
Montana

    For Respondent:

        Joseph P. Mazurek, Attorney General, John Paulson,
Assistant Attorney General, Helena, Montana;
Charles Sprinkle, Lincoln County Attorney, Libby,
Montana

Submitted on Briefs:  March 7, 1996

Decided:  November 25, 1996

Filed:

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

Following a jury trial in the Nineteenth Judicial District Court, Lincoln County, appellant Ronda K. Williams-Rusch (Ronda) was acquitted of the offense of conspiracy, a felony, and convicted of tampering with a witness or informant, a felony. We affirm.

Ronda raises the following issues on appeal:

1. Did the District Court err in failing to dismiss the prosecution on the grounds of outrageous government conduct?

2. Did the District Court err in allowing the State to prosecute Ronda for witness tampering?

3. Did the District Court err in failing to dismiss the prosecution on the grounds of denial of a speedy trial?

4. Did the District Court have subject matter jurisdiction over the offense of witness tampering?

Factual and Procedural Background

On August 16, 1992, two law enforcement officers with the U.S. Forest Service came across a campsite near the Fisher River in the Kootenai National Forest about 15 miles from Libby. No one was at the campsite at the time. Next to a trailer in the camp the officers observed some bags of potting soil and several cardboard boxes containing 15 to 20 small plants growing in styrofoam cups. The officers obtained a leaf from one of the plants which later tested positive as marijuana.

Over the next three days, officers from the Lincoln County Sheriff's Office and the U.S. Forest Service conducted a surveillance of the campsite, which was occupied by Ronda, her

2

husband, Mike Rusch, her boyfriend, Randell Nealy, and her nine-year-old daughter, Tracy Rusch. On August 20, 1992, the Justice of the Peace issued a warrant to search the campsite and seize all marijuana plants and seeds, drug paraphernalia, records of drug transactions, and cash. That same day, as officers from the Sheriff's Office conducted a search, they discovered approximately 50 marijuana plants growing a short distance from the campsite. The officers arrested Ronda and her two male companions and transported them to the Lincoln County detention facility. Ronda's daughter, Tracy, was placed in the care of child protective services. The officers confiscated all of the items located at the campsite including several videotapes. Some of these items were marked as evidence and others were held for safekeeping.

The day after Ronda's arrest and the seizure of items from the campsite, Officer Klint Gassett (Gassett) played the videotapes on the VCR in his office. The Chief of Detectives had instructed Gassett to view the tapes to determine if they had any evidentiary value. However, instead of depicting drug transactions, the tapes showed Ronda engaging in sexual acts with Nealy. The television on which Gassett viewed the tapes is mounted on a wall facing the door of the office he shares with several other officers. Several officers and others entered the room at various times during the viewing of the videotapes and saw all or part of the tapes.

That same afternoon, Gassett removed Ronda from her cell to interview her. Gassett accompanied Ronda to the squad room which is the only area in the Sheriff's Office where smoking is

3

permitted. He advised Ronda that if she needed to smoke she could request to speak to him and he would escort her to the squad room. Ronda later alleged that during this and other later interviews, Gassett made suggestive comments to her about her performance on the videotapes. At the time of the first interview, Ronda had not yet made an initial appearance. She appeared before the Justice of the Peace later that afternoon, at which time counsel was appointed to represent her. Bail was set at $50,000.

On August 24, 1992, Ronda waived her right to a preliminary hearing and requested that the District Court release her upon her own recognizance. Ronda was released from jail the following day. On August 26, 1992, the State formally charged Ronda by information with one count of criminal possession with intent to sell, a felony, in violation of § 45-9-103, MCA. She was arraigned on this charge on August 31, 1992, and pleaded not guilty.

On August 27, 1992, Ronda appeared before the District Court and requested the Sheriff's Office return her personal property. The court so ordered and the following day, Ronda supplied the Sheriff's Office with a list of the personal property that she sought returned. The list included a notation for "tapes-musical & video."

Ronda's tapes were not returned as ordered, so on September 1, 1992, she requested that the District Court direct an order to the State to show cause why her personal property had not been returned to her. Ronda appeared in District Court the next day and again requested that her personal property be returned. The court

4

ordered that Ronda's personal property be delivered to her residence by 11:00 a.m. the following day. Not only were the videotapes not returned to Ronda on the date and time specified by the court, but the videotapes were instead shown that same day to several detectives from Seattle, Washington, who had arrived in Libby to interview Michael Rusch. The same day the tapes were to be returned, the Lincoln County Sheriff's Office arrested Ronda on a warrant from Oregon and incarcerated her in the Lincoln County jail.

On September 10, 1992, the Lincoln County Attorney directed Officer Gassett to make copies of the videotapes. The following day, after receiving an order from the District Court requiring that the Sheriff's Office release all of Ronda's personal property to Ronda's sister and to release the videotapes to Ronda's attorney, two officers attempted to locate the tapes in the evidence locker, but they were unsuccessful. The videotapes were later located at Gassett's home and delivered to Ronda's attorney.

On September 14, 1992, Ronda moved the District Court to order the release of any copies of the videotapes. The court so ordered, however, the Sheriff's Office responded that it had been unsuccessful in its attempts to make copies of the videotapes, thus no copies were in existence.

Ronda was extradited to Oregon to face charges there on September 16, 1992. On October 5, 1992, Ronda moved to dismiss the Montana action on the grounds of outrageous government conduct in the seizure, use and possession by the State of the sexually

5

explicit videotapes and the sexual harassment of her by State employees. She later moved to continue the hearing on this motion because she was still incarcerated in Oregon.

On November 18, 1992, the State moved to amend the information to include the alternative offense of conspiracy, a felony, in violation of §§ 45-9-101 and 45-4-102, MCA, and to add a charge of tampering with witnesses or informants, a felony, in violation of § 45-7-206, MCA. The State filed a new complaint in Justice Court charging Ronda with witness tampering and bond was set at $10,000. A November 23, 1992 hearing on the motion to amend the information was continued until Ronda could be personally present.

Ronda returned to Montana on April 26, 1993, her Oregon charges having been settled, and the District Court released her on her own recognizance. On May 12, 1993, the court held a hearing on Ronda's motion to dismiss for outrageous government conduct and granted the State's motion to amend the information.

Ronda was arraigned on the charges in the amended information on June 10, 1993, and pleaded not guilty. On July 12, 1993, the District Court conducted an omnibus hearing and set trial in this matter for January 11, 1994. On July 19, 1993, Ronda moved to suppress her August 21, 1992 statement on the grounds that Gassett's actions in eliciting the statement deprived her of a speedy initial appearance and her right to counsel. A few weeks later, Ronda also moved to suppress evidence seized in the search of the campsite on the grounds the search was oppressive and overly broad.

6

On January 3, 1994, Ronda moved to dismiss the information on the grounds that the State had violated her right to a speedy trial. Two days later, the State moved to continue the trial due to its failure to secure the presence of out-of-state witnesses. The District Court reset the trial for February 14, 1994.

On the day set for trial, the District Court granted Ronda's motions to suppress her statement and certain items of evidence and denied her motion to dismiss on the grounds of outrageous government conduct. Following a 3-day trial and the dismissal of the charge of criminal possession with intent to sell, the jury found Ronda not guilty of the alternative charge of conspiracy and found her guilty of tampering with a witness. Ronda filed a motion for a judgment notwithstanding the verdict on the grounds that her right to a speedy trial had been denied. The motion was deemed to be a motion for a new trial and denied by the District Court. On March 29, 1994, the court sentenced Ronda to ten years in prison, all of which was suspended, and placed her on probation.

Ronda now appeals the denial of her motion to dismiss on the grounds of outrageous government conduct, the denial of her motion to dismiss for lack of sufficient evidence to prove the charge of witness tampering, and the denial of her motion to dismiss for lack of a speedy trial.

Issue 1.

Did the District Court err in failing to dismiss the prosecution on the grounds of outrageous government conduct?

Ronda claims that as a consequence of this prosecution, she

7

was subjected by government agents to a violation of her right to counsel, her right to remain silent, her right to be free from unreasonable search, her right to a timely initial appearance and release from incarceration, and her right to be free from the civil wrongs of sexual harassment, invasion of privacy, and the conversion of her personal property. She contends that the totality of her treatment by the government was outrageous and the only appropriate remedy is dismissal of this action with prejudice. However, Ronda's constitutional rights concerning the searches and the pre-appearance interrogation were fully vindicated when the District Court ordered that Ronda's August 21, 1992 statement and certain items of evidence be suppressed. The focus of Ronda's claim of outrageous government conduct in this appeal rests upon the handling of the videotapes by the Sheriff's Office.

The United States Supreme Court first enunciated the defense of outrageous government conduct in United States v. Russell (1973), 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366. In Russell, an undercover narcotics agent investigating the defendant and his confederates supplied the defendant with one of the ingredients necessary to manufacture methamphetamine. Although this ingredient was a legal substance, it was difficult to obtain. Based on evidence obtained by the narcotics agent, the defendant was eventually convicted of three counts of unlawfully manufacturing and selling methamphetamine. On appeal, the United States Court of Appeals for the Ninth Circuit reversed the conviction concluding that as a matter of law "a defense to a criminal charge may be

8

founded upon an intolerable degree of governmental participation in the criminal enterprise." United States v. Russell (9th Cir. 1972), 459 F.2d 671, 673. However, the United States Supreme Court reversed the Court of Appeals stating:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . . the instant case is distinctly not of that breed.

Russell, 411 U.S. at 431-32, 93 S.Ct. at 1643, 36 L.Ed.2d at 373.

Since the Supreme Court's determination in Russell, both state and federal decisions have limited the outrageous government conduct defense to extreme cases in which the government has essentially manufactured the crime or has generated new crimes merely for the sake of pressing criminal charges against the defendant. State v. DeAngelo (Or.App. 1992), 830 P.2d 630, 632-33 (citing State v. McArdle/Harrelson (Or.App. 1988), 754 P.2d 918); United States v. Stenberg (9th Cir. 1986), 803 F.2d 422; United States v. Bogart (9th Cir. 1986), 783 F.2d 1428 *vacated on other grounds sub nom. United States v. Wingender (1986), 790 F.2d 802.*

The doctrine is a "most narrow" defense. State v. Briner (1992), 253 Mont. 158, 164, 831 P.2d 1365, 1369. In State v. Haskins (1992), 255 Mont. 202, 841 P.2d 542, this Court upheld the District Court's denial of a defendant's motion to dismiss for outrageous government conduct because the defendant failed to show how the alleged police misconduct violated the defendant's constitutional rights relating to the crimes charged. See also State v. Romero (Mont. No. 95-067, decided November 6, 1996)

9

(holding that the defendant lacked standing to raise a claim of outrageous government conduct).

So too must Ronda's claim fail in the case before us as the record does not show any connection between the challenged government conduct regarding the videotapes and the commission of the acts which constituted Ronda's conviction for tampering with a witness. Ronda has failed to show that the Sheriff's officers instigated any of the criminal activity which led to her charges or conviction, nor did she demonstrate that the government manufactured any of the crimes with which she was charged and convicted or that it generated new crimes merely for the sake of pressing criminal charges against her.

In denying Ronda's motion to dismiss for outrageous government conduct, the District Court determined that it is not inappropriate for government agents to view home videos seized in the course of a drug raid to find evidence consistent with the crimes charged as well as the identities of persons connected with the crimes. While we agree with this determination of the District Court, we do not in any way condone the way the officers conducted the viewing or handling of the videos.

However, the appropriate remedy for Ronda's allegations of government misconduct in this case is not dismissal of the action. Rather, as we pointed out in Haskins, the appropriate remedy is to bring a federal civil rights action pursuant to 42 U.S.C. § 1983.

> If the police engage in illegal activity in concert with
> a defendant beyond the scope of their duties the remedy
> lies, not in freeing the equally culpable defendant, but
> in prosecuting the police under the applicable provision

10

of state or federal law.

Haskins, 841 P.2d at 546 (quoting Hampton v. United States (1976), 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113, 119). Since Ronda is presently pursuing those civil remedies, we decline further comment on the matter of the government's conduct in this case.

We hold, simply, that the District Court did not err in denying Ronda's motion to dismiss on the grounds of outrageous government conduct as Ronda failed to demonstrate that the conduct of the Sheriff's officers in handling and viewing the videotapes led to her charges or conviction, nor did she establish that the government manufactured any of the crimes with which she was charged and convicted or that it generated new crimes merely for the sake of pressing criminal charges against her.

### Issue 2.

Did the District Court err in allowing the State to prosecute Ronda for witness tampering?

On November 18, 1992, the State filed a Motion to Amend the Information by adding the alternative charge of conspiracy, a felony, in violation of §§ 45-9-101 and 45-4-102, MCA, and by joining as Count II the charge of tampering with witnesses or informants, a felony, in violation of § 45-7-206, MCA. The State attached a supporting affidavit filed in Justice Court for the new charge of tampering with witnesses or informants.

Ronda maintains that the crime of tampering with a witness is an attempt crime and that under § 45-4-103, MCA, she cannot be

11

liable for an attempt crime if she avoided the commission of the offense attempted by abandoning her criminal effort. She contends that she did abandon her criminal effort when she advised Tracy in a letter dated October 10, 1992, to "tell the truth."

Section 45-7-206, MCA, provides, in part:

> **Tampering with witnesses and informants.** (1) A person commits the offense of tampering with witnesses and informants if, believing that an official proceeding or investigation is pending or about to be instituted, he purposely or knowingly attempts to induce or otherwise cause a witness or informant to:
> (a) testify or inform falsely;
> (b) withhold any testimony, information, document, or thing;
> (c) elude legal process summoning him to testify or supply evidence; or
> (d) absent himself from any proceeding or investigation to which he has been summoned.

Ronda was not charged with attempted tampering with a witness, and the statutory defense to attempt would, by its own terms, be inapplicable to the charge of a completed offense. All that is required to complete the offense is the purposeful or knowing attempt to influence the witness. Section 45-7-206, MCA. Ronda committed and completed the offense when she made her initial efforts to get Tracy to withhold information and testify falsely long before she wrote the letter to Tracy. The defense of abandonment of attempt is not available to a defendant where substantial harm has been inflicted or acts of danger completed. State v. Mahoney (1994), 264 Mont. 89, 99-100, 870 P.2d 65, 72. Where, as here, the essential elements of the criminal enterprise have been already accomplished, the defense of abandonment is not applicable; the criminal act is *fait accompli*, and cannot be undone.

12

Moreover, Ronda's letter to Tracy says, in actuality, "You will have to tell the truth - of how I was never over in those plants cause they think you and I were over there - or at least you." Contrary to Ronda's assertion that she abandoned her efforts to influence Tracy when she urged Tracy to tell the truth, Ronda tells Tracy in the letter exactly what "truth" Ronda wants Tracy to tell.

Ronda also contends that the affidavit in support of the amended information fails to set forth sufficient facts to merit a finding of probable cause. However, the affidavit states, in part, as follows:

> 3. . . . During the time that Defendant was out of jail, Defendant repeatedly told Tracie [sic] not to talk to anyone about what had occurred while they were camping. Defendant told Tracie that it "is not a lie if you don't say anything."
> . . .
> 5. Beverly Miller ("Miller"), a Lincoln County Social Worker, recalls being at the Sheriff's office while Tracie was visiting her mother on or about September 11, 1992. Miller was not immediately near Tracie during most of the visit. Miller came into the view room at one point during the visit. She saw police reports being shown to Tracie, with portions of the report underlined. Miller terminated the interview. After leaving the interview, Miller talked to Tracie. Tracie was upset and was saying she did not want to testify. Up to that point, no one had mentioned [to] Tracie that she would have to testify.
> 6. . . . Across the top of the [police report that Defendant showed Tracie] the words "Do not talk to anybody, see what you did" were written. . . .
> 7. Tracie received a letter from Defendant in late October, 1992. The letter discussed the possibility that Tracie might be called as a witness in the trial of Defendant. The letters [sic] says in part "You will have to tell the truth - of how I was never over in those plants cause they think you and I were over there - or at least you - Daddy already told them that I didn't know anything about it. But they are saying you took them to the plants. Did you take them? Or did they take you?

You have to be careful because they might try to get you on the stand and confuse you. . . . I can't believe they would try and get you to testify against your Mom! It's really sick! . . . But since the police say you are a witness against me and for them - we had better cover all the stuff that went on. . . .

8. . . . Defendant told Tracie during the time that the marijuana plants were growing that Tracie was to be "hush-hush" about the plants.

This Court has stated that an affidavit filed in support of a motion for leave to file an information need only recite facts sufficient to indicate a probability that the defendant committed an offense; it need not demonstrate a prima facie case. State v. Little (1993), 260 Mont. 460, 469, 861 P.2d 154, 160 (citing State v. Ramstead (1990), 243 Mont. 162, 165-66, 793 P.2d 802, 804). Clearly, the affidavit in this case filed in support of the motion for leave to file an information does recite facts sufficient to indicate a probability that Ronda committed the offense of tampering with a witness.

Accordingly, we hold that the District Court did not err in allowing the State to prosecute Ronda for witness tampering as the affidavit established probable cause to believe that the crime had been committed.

Issue 3.

Did the District Court err in failing to dismiss the prosecution on the grounds of denial of a speedy trial?

Ronda was arrested on August 20, 1992, and arraigned on August 31, 1992. She filed a motion to dismiss for lack of a speedy trial on January 3, 1994, but the District Court denied her motion and trial commenced on February 14, 1994.

14

The Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution guarantee a criminal defendant the right to a speedy trial. Whether that right has been violated is determined by a four-part test set out in Barker v. Wingo (1972), 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 116-17, and adopted by this Court in State ex rel. Briceno v. Dist. Ct. of 13th Jud. Dist. (1977), 173 Mont. 516, 518, 568 P.2d 162, 163-64.

This test requires a balancing of the following four factors: (1) the length of the delay; (2) the reason for the delay; (3) the assertion of the right by the defendant; and (4) prejudice to the defendant. State v. Collier (Mont. 1996), 919 P.2d 376, 381-82, 53 St.Rep. 534, 536 (citing State v. Matthews (1995), 271 Mont. 24, 27-28, 894 P.2d 285, 287). All four factors are weighed by considering the facts and circumstances of each case; no one factor is determinative. Collier, 919 P.2d at 382.

The first factor, length of the delay, triggers further inquiry into the remaining three factors. It is not necessary to consider the remaining factors unless the length of the delay is presumptively prejudicial. Collier, 919 P.2d at 382 (citing State v. Eklund (1994), 264 Mont. 420, 424, 872 P.2d 323, 326). When considering the length of the delay, no regard is given to which party caused the delay. Collier, 919 P.2d at 382.

Ronda was arrested on August 20, 1992, and trial was held on February 14, 1994, a delay of 543 days. We have previously stated that a delay of over 200 days will trigger further analysis.

15

Collier, 919 P.2d at 382. Thus the 543-day delay in the instant case is presumptively prejudicial warranting an analysis of the remaining three factors. Once the delay has been determined to be presumptively prejudicial, the State has the burden to provide a reasonable explanation for the delay and to show that the defendant was not prejudiced by the delay. Collier, 919 P.2d at 382.

The second factor, reason for the delay, requires us to allocate portions of the overall delay to the party responsible for causing that particular delay. Ronda argues that most of the delay in this case is attributable to the State, including a majority of the delay while she was incarcerated in Oregon on other charges.

Ronda was arraigned on August 31, 1992, and an omnibus hearing was scheduled for September 14, 1992. Thus the 25-day delay from Ronda's arrest on August 20, 1992, until her omnibus hearing on September 14, 1992, is attributable to the State. However, this delay may be characterized as institutional delay rather than intentional delay. Institutional delay, though charged against the State, weighs less heavily than intentional delay. State v. Gould (1995), 273 Mont. 207, 216, 902 P.2d 532, 538.

At the September 14, 1992 omnibus hearing, Ronda requested a continuance to October 5, 1992, which the District Court granted. Ronda was extradited to Oregon on September 16, 1992, to face charges in that state. On October 5, 1992, Ronda's attorney filed on Ronda's behalf, a motion to dismiss for outrageous government conduct. A hearing on this motion was set for October 26, 1992. However, three days before the scheduled hearing, Ronda, through

16

her attorney, moved to continue the hearing until Ronda could be personally present to testify. Having made the motion for a continuance, defense counsel at no time objected to the fact that Ronda was not within the jurisdiction of the court. Even though it is the State's obligation to move a case forward, where the defendant requests and obtains a continuance, the delay resulting from that continuance should not be charged to the State. "[D]elay[s] in bringing a defendant to trial *caused or consented to by defendant* are considered to constitute a waiver of the right to be tried within the time fixed by statute or required by the constitution." State v. Robbins (1985), 218 Mont. 107, 116, 708 P.2d 227, 233 (emphasis added).

Ronda returned to Montana on April 26, 1993. At a bond hearing on that date, the District Court released Ronda on her own recognizance and set May 12, 1993, as the time for hearing Ronda's motion to dismiss for outrageous government conduct. Commencing May 12, 1993, the District Court held a three-day hearing on Ronda's motion to dismiss. This motion was denied by the court. On June 7, 1993, upon a motion by Ronda, the court reset the hearing on her plea to the amended charges to June 10, 1993. The District Court then granted Ronda's motion to continue the omnibus hearing scheduled for June 10, 1993, to July 12, 1993. Thus 278 days of the 301-day delay from September 14, 1992, until July 12, 1993, were caused by Ronda's various motions and are attributable to Ronda. Only 23 days of that time are attributable to the State.

At the July 12, 1993 omnibus hearing, the District Court set

17

January 11, 1994, as the date for trial in this matter. Thus the 183-day delay from the omnibus hearing to the January trial date is attributed to the State as institutional delay. However, it bears noting that Ronda made no objection at this hearing to trial being set for almost six months later. Moreover, Ronda filed several motions after the omnibus hearing, all of which required response by the State and a hearing. If trial had not already been set for six months hence, Ronda's motions would have delayed the start of her trial in any event.

On January 5, 1994, the State moved to continue the trial scheduled for January 11, 1994, because it was unable to locate certain out of state witnesses. While nothing in the record supports a conclusion that the State's motion was made in bad faith or simply to delay the trial of this case, the continuance was at the State's request and for its benefit and to that extent, must be characterized as "intentional." Accordingly, the time lost being not properly charged merely as institutional delay, the 34-day delay from January 11, 1994, to February 14, 1994, when trial commenced, is attributable at full weight to the State.

Of the 543 days between Ronda's arrest on August 20, 1992, and the commencement of trial on February 14, 1994, 278 days are attributable to Ronda and 265 days are attributable to the State, of which only 34 days were "intentional" delay. As we stated previously in this opinion, institutional delay weighs less heavily against the State than intentional delay. Gould, 902 P.2d at 538.

The third factor, assertion of the right by defendant, was

18

satisfied when Ronda moved to dismiss on speedy trial grounds prior to trial. However, by filing her motion to dismiss only one week before trial was to commence, Ronda exhibited a lack of actual interest which should be considered in balancing the Barker factors. State v. Thompson (1993), 263 Mont. 17, 32-33, 865 P.2d 1125, 1135 (citing State v. Mooney (1991), 248 Mont. 115, 119-20, 809 P.2d 591, 594). As we pointed out in Thompson, a defendant's failure to object to a trial date at the omnibus hearing must be considered in the defendant's later assertion of a claim of denial of a speedy trial. Thompson, 865 P.2d at 1135. In the present case, Ronda did not object at the July 12, 1993 omnibus hearing when trial was set for January 11, 1994, almost six months later.

Prejudice to the defendant, the fourth factor of the Barker test, is analyzed by assessing three interests which the right to a speedy trial was designed to protect: (1) prevention of oppressive pretrial incarceration; (2) minimization of the defendant's anxiety and concern; and (3) avoidance of impairment of the defense. The last of these being the most critical factor. Collier, 919 P.2d at 383.

First, except for a few days after her arrest on the Montana charges and the period of time she was incarcerated in Oregon, Ronda was released on her own recognizance while she awaited trial on this matter. Thus, she was not subjected to excessive or oppressive pretrial incarceration as a result of the Montana charges.

Second, this Court has previously stated that since it is

19

nearly impossible for the State to prove that anxiety and concern do *not* exist, the State's burden to show a lack of anxiety becomes considerably lighter in the absence of more than marginal evidence of anxiety. State v. Atkins (Mont. 1996), 920 P.2d 481, 484, 53 St.Rep. 561, 562; State v. Weeks (1995), 270 Mont. 63, 74, 891 P.2d 477, 483. Here, Ronda makes no claim that she experienced any anxiety or concern which was aggravated as a result of the delay. This Court should not presume prejudice in the absence of anxiety and concern which exceeds that inherent in being charged with a crime. State v. Moore (1994), 268 Mont. 20, 69, 885 P.2d 457, 487-88.

Third, Ronda claims prejudice because of Tracy's "memory loss." She contends that Tracy's inability to recall statements that she gave to Sheriff's officers and others a year earlier, placed the State in the "comfortable position of proving its case solely upon hearsay," and, consequently, the lack of a speedy trial effectively deprived Ronda of her right to confront and cross-examine Tracy. On the contrary, a review of Tracy's testimony at trial reveals that Tracy was able to testify affirmatively that she did not make the critical statements and, accordingly, the officers could properly testify about Tracy's prior inconsistent statements under Rule 801(d)(1), M.R.Evid. Moreover, this Court has noted that a defendant suffers no prejudice, for purposes of a speedy trial analysis, if a child witness' loss of memory is beneficial to the defense. State v. Scott (1993), 257 Mont. 454, 459-60, 850 P.2d 286, 289; State v. Eklund (1994), 264 Mont. 420, 426, 872 P.2d

20

323, 327.

The dissent insists that the only evidence linking Ronda to the charge of witness tampering is Tracy's prior statement to law enforcement officials. On the contrary, as we stated in our discussion under Issue 2, in addition to Tracy's prior statement to law enforcement officers, the evidence against Ronda includes Ronda's own letter to Tracy and the testimony of a social worker who observed an attempt by Ronda to influence Tracy.

Therefore, weighing the facts and circumstances in this case with the factors set forth in <u>Barker</u> establishes that Ronda did not suffer any prejudice in her defense from the delays, whether those delays were attributable to the State or to Ronda. Accordingly, we hold that Ronda's right to a speedy trial was not violated and the District Court did not err in denying her motion to dismiss on speedy trial grounds.

## Issue 4.

Did the District Court have subject matter jurisdiction over the offense of witness tampering?

Ronda contends that the crime of tampering with a witness does not apply to the constitutionally protected relationship of a parent and child and thus the District Court did not have subject matter jurisdiction over this issue. Ronda raised this issue for the first time in her reply brief to this Court. Under § 46-13-101, MCA, most defenses or objections to a criminal charge that are capable of determination without trial must be raised at or before the omnibus hearing. Failure to raise such defenses or objections

21

prior to trial constitutes a waiver of the defense or objection. However, lack of jurisdiction is a non-waivable defect and must be noticed by the court at any time during the pendency of the proceeding. Section 46-13-101(3), MCA.

The State contends that although Ronda invokes the term "subject matter jurisdiction," her challenge does not go to the fundamental authority of a district court to adjudicate a witness tampering case but rather to the constitutionality of applying the witness tampering statute to her case. Citing City of Columbia Falls v. Bennett (1991), 247 Mont. 298, 806 P.2d 25, the State argues that where the constitutionality of a statute is challenged for the first time in an appellant's reply brief, it is improper for this Court to address the issue in its opinion.

We find no merit in Ronda's argument. District Courts are courts of general jurisdiction and have jurisdiction over felonies. Section 3-5-302(1)(a), MCA; State v. Barnes (1988), 232 Mont. 405, 409, 758 P.2d 264, 267. We concur with the State's contention that Ronda is attempting to argue the constitutionality of applying the witness tampering statute to her case. Since Ronda did not raise this issue until she filed her reply brief, she waived her right to raise this issue on appeal and we decline to address this issue.

Affirmed.

_____
Justice

We Concur:

_____
J.A. Turnage
Chief Justice

22

_Karla M. Gray_
_____

_____

_____
Justices

23

Justice Terry N. Trieweiler specially concurring in part and dissenting in part.

I concur with the majority's disposition of Issues 1, 2, and 4.

I dissent from the majority's conclusion that the defendant was not denied her constitutional right to a speedy trial.

The defendant was arrested on August 20, 1992, and was not tried until February 14, 1994--543 days later. The majority concedes, based on our prior decisions, that a delay of nearly one and one-half years from the date of arrest to the date of trial is presumptively prejudicial. The majority also concedes that the defendant timely asserted her right to a speedy trial. However, the majority then avoids enforcement of this defendant's constitutional right to a speedy trial by concluding that 278 days of the delay is the fault of the defendant for moving to continue a hearing while she was incarcerated out of state, and by further concluding that the defendant has failed to show prejudice from a nearly one and one-half year delay (apparently forgetting the earlier presumption of prejudice).

I disagree with the majority's conclusion for two reasons: (1) The 278 days attributed by the majority to Ronda were not, in fact, a result of her motions. They were due to her incarceration out of state. When the majority, in effect, held that the defendant's time in Oregon is attributed to her for purposes of speedy trial analysis, it completely ignored our holding in *State v. Robbins* (1985), 218 Mont. 107, 116-17, 708 P.2d 227, 233-34; and (2) when the majority concluded that the defendant had failed to

24

establish prejudice from the one and one-half year delay of her trial, it completely ignored the fact that prejudice was presumed and the State failed to in any way rebut the presumption.

The issue in *Robbins* was stated as follows: "The real issue, however, is whether Robbins or the State should be charged with the time Robbins was in Idaho <u>resisting extradition to Montana</u>." *Robbins*, 218 Mont. at 115, 708 P.2d at 233 (emphasis added).

This Court held that that time during which a defendant, incarcerated out of state resists extradition to Montana is not attributable to the State for purposes of calculating the length of delay. However, this Court went on to state that:

> Diligent prosecution includes a timely demand for extradition of a defendant, and extradition proceedings are a sufficient reason for delay if the State has been diligent. *State v. Smith*, supra. The right of a defendant to resist formal extradition, however, cannot be charged to the State when computing the length of delay for speedy trial, if the State is acting in good faith. *Balla*, supra. The right of a defendant to a speedy trial commences when he becomes an accused. *Marion, Smith, Larson*, and *Ackley*, supra. The court then must acquire in personam jurisdiction over the accused to engage in proceedings leading to a trial. If the accused is out of state, the State must act diligently and in good faith to acquire jurisdiction. At the same time, the accused has a right to resist extradition. When he does so, however, he loses those days he resists from computation of length of delay. <u>When an accused does not resist, those days should not be weighed against him when the State is acting diligently and in good faith.</u> For this reason, inclusion of those days in computing the length of delay, as was done in *Ackley*, will no longer be the rule. <u>Only those days an accused actively resists extradition will be included.</u> Days in which the court does not or cannot, through the State's efforts, acquire jurisdiction over an accused will be counted against the accused and will not be included in computing the length of delay.

*Robbins*, 218 Mont. at 116-17, 708 P.2d at 233-34 (emphasis added).

25

In this case, there is no evidence that the defendant ever resisted extradition. Neither is there evidence that the State acted diligently to seek extradition. Therefore, based on *Robbins*, there is no justification for attributing to her the 222 days she was in Oregon for purposes of deciding whether she was denied her constitutional right to a speedy trial.

The majority circumvents the holding in *Robbins* by concluding that, because the defendant moved to continue a hearing until she could return from out of state and be personally present, the time out of state is now attributable to her. That holding ignores the reason for her motion, and effectively reverses our prior holding in *Robbins*, without ever saying so. If her time of incarceration out of state is assigned to the State, and if her motion was necessary because she was incarcerated out of state, how can the delay be attributed to her? The majority's solution is little more than a shell game. When the 222 days erroneously attributed to the defendant is added to the 265 days which the majority concedes is attributable to the State, the actual period during which defendant was denied her right to a speedy trial is 487 days.

Since the majority concedes that we have, in the past, found a delay of 200 days to be presumptively prejudicial, a delay of over twice that length certainly creates a presumption of prejudice. We have recently held that where the presumption of prejudice attaches and is not rebutted by the State, and where the other factors from the test set forth in *Barker v. Wingo* (1972), 407 U.S. 514, 530, are satisfied--as the majority concedes they are in

26

this case--a conclusion that the right to a speedy trial was denied is necessary. *State v. Tweedy* (1996), 922 P.2d 1134, 1140, 53 St. Rep. 656, 661. In that case we held that:

> When the delay is presumptively prejudicial, the burden shifts to the State to rebut the presumption by showing a reasonable explanation for the delay and demonstrating that the defendant was not prejudiced by the delay.

*Tweedy*, 922 P.2d at 1138, 53 St. Rep. at 659 (citing *State v. Matthews* (1995), 271 Mont. 24, 28, 894 P.2d 285, 287).

Here, there was no reasonable explanation for a delay of 487 days. Merely asserting that the delay was institutional, rather than by design of the prosecution, is not an adequate explanation. As the majority acknowledges, institutional delay is attributed to the State. It is the State's duty to bring the defendant to trial. The State cannot sit back for nearly one and one-half years and be satisfied that the district court has not set a trial date.

Furthermore, the State did nothing to demonstrate that the defendant was not prejudiced by the delay. In fact, the primary evidence which linked the defendant to witness tampering was a very old statement made by a child to law enforcement officials. That child repudiated the statement at the time of trial. Whether her repudiation was due to the passage of time and failure of her memory, or a conscious decision on her part not to deny her earlier statement is speculative. The fact is, she was no longer available for cross-examination, and the defendant was unable to cross-examine the prior statements which were used as substantive evidence against her. Whether these facts would be sufficient by themselves to establish prejudice is irrelevant. The critical

27

point is that the State did nothing to satisfy its burden that it demonstrate an absence of prejudice. In *Tweedy* we found that failure conclusive. We held:

> Moreover, given the presumptively prejudicial delay, the burden shifted to the State in this case to rebut the presumed prejudice. *Matthews*, 894 P.2d at 287. The State did not respond to Tweedy's motion via either a brief or argument at the hearing. It did not present any evidence, as required by *Matthews*, to prove that Tweedy was not prejudiced. *See Matthews*, 894 P.2d at 289.
>
> . . . More importantly, the appropriate place to respond to Tweedy's claim of prejudice was in the District Court, not in this Court. The State could, and should, have done so by responding to Tweedy's motion and requesting an evidentiary hearing to rebut his claims. It did not.
>
> . . . .
>
> Once the burden has shifted to the State to rebut presumed prejudice, however, it is the State's duty to respond to a speedy trial motion and to properly raise, for resolution by the district court, the issues related thereto. Under the well-established principle that we will not consider an issue raised for the first time on appeal, the State acts at its own peril if it fails to do so. *See Weeks*, 891 P.2d at 491.
>
> In this case, the State failed to raise either its fact-based responses or its legal authority regarding the sufficiency of Tweedy's assertions in the District Court. Thus, on this record, we conclude that the State failed to meet its burden of rebutting the presumed prejudice to the defense as a matter of law. Consequently, we weigh the prejudice factor in Tweedy's favor.

*Tweedy*, 922 P.2d at 1139-40, 53 St. Rep. at 660-61.

For the same reasons that the charges against the defendant in *Tweedy* were dismissed, the charges against this defendant should have been dismissed. She was unquestionably denied her right to a speedy trial. Prejudice from that denial was presumed. The State did nothing to rebut the presumption of prejudice.

28

The greater problem with the majority opinion is that it adds to the mish-mash of result-oriented case law from this Court with regard to the speedy trial issue. Speedy trial case law in Montana will soon rival our decisions that apply Rule 404(b), M.R.Evid., for inconsistency.

On the one hand, we have consistently held that a delay of more than 200 days gives rise to a presumption of prejudice. *See e.g. State v. Wombolt* (1988), 231 Mont. 400, 402-03, 753 P.2d 330, 331 (214 days); *State v. Palmer* (1986), 223 Mont. 25, 27-28, 723 P.2d 956, 958 (256 days); *State v. Chavez* (1984), 213 Mont. 434, 441-42, 691 P.2d 1365, 1370 (214 days); *State v. Ackley* (1982), 201 Mont. 252, 256, 653 P.2d 851, 853 (257 days). On the other hand, without regard to that presumption, we hold defendants to the burden of proving prejudice, as we have done in this case.

We attribute institutional delay to the State, *Wombolt*, 231 Mont. at 403, 753 P.2d at 331-32, and *Ackley*, 201 Mont. at 256, 653 P.2d at 853-54, but then conclude that institutional delay does not weigh as heavily against the State as intentional delay. *Wombolt*, 231 Mont. at 403, 753 P.2d at 331-32; *Chavez*, 213 Mont. at 442, 691 P.2d at 1370. This Court has lost sight of the reasons for which speedy trials are necessary, and has concluded that the passage of time for one reason is less detrimental to a trial on the merits than the passage of time for another reason.

On the one hand, we hold that it is sufficient to assert the right to a speedy trial prior to the date of trial, *Wombolt*, 231

29

Mont. at 403, 753 P.2d at 332, *State v. Waters* (1987), 228 Mont. 490, 493, 743 P.2d 617, 620, and *State v. Steward* (1975), 168 Mont. 385, 390, 543 P.2d 178, 182, but then, in this case, we conclude that the assertion of the right one week before trial does not satisfy the obligation quite as well as if it had been asserted earlier.

Finally, we previously held that time while incarcerated out of state would not be attributed to the defendant for purposes of speedy trial analysis. *Robbins*, 218 Mont. at 116, 708 P.2d at 233-34. Now, in this case, without distinguishing our prior holding in *Robbins*, we simply conclude that if some procedural matter is continued due to that out-of-state incarceration, the time is attributable to the defendant.

I doubt at this point that anyone, whether it be a defense lawyer, prosecutor, or district judge, can make sufficient sense out of this Court's speedy trial analyses to apply them in any practical or predictable way. This decision further confuses the situation. For these reasons, I dissent from Issue 3 of the majority opinion.

_____
Justice

Justices William E. Hunt, Sr., and W. William Leaphart join in the foregoing concurring and dissenting opinion.

_____
Justice

_____
Justice

30