

DA 10-0535, DA 10-0536, DA 10-0538

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 323

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

BRYAN DEAN LEMAY,

        Defendant and Appellant.

| APPEAL FROM: | District Court of the Seventh Judicial District, In and For the County of Richland, Cause Nos. DC-09-31, DC-09-39, and DC-09-48 Honorable Katherine M. Irigoin, Presiding Judge |
| --- | --- |

COUNSEL OF RECORD:

      For Appellant:

          Joslyn Hunt, Chief Appellate Defender, Lisa S. Korchinski, Assistant Appellate Defender, Helena, Montana

      For Appellee:

          Steve Bullock, Montana Attorney General, C. Mark Fowler, Assistant Attorney General, Helena, Montana

          Mike Weber, Richland County Attorney, T.R. Halvorson, Deputy County Attorney, Sidney, Montana

Submitted on Briefs: November 2, 2011

Decided: December 22, 2011

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Bryan LeMay appeals the Judgment and Sentence of the District Court for the Seventh Judicial District, Richland County, convicting him of numerous offenses ranging from disorderly conduct to assault with a weapon, in three separate causes of action. We affirm.

¶2    Because many of LeMay's issues and arguments in these three causes of action overlap, we have consolidated them into this one Opinion in which we address the following five issues:

¶3    1. Whether the District Court erred when it denied LeMay's motion to dismiss on the grounds of outrageous government conduct.

¶4    2. Whether LeMay received ineffective assistance of counsel.

¶5    3. Whether the District Court erred when it denied LeMay's motion to withdraw his nolo contendere pleas.

¶6    4. Whether the District Court erred when it denied LeMay's motion to suppress for lack of particularized suspicion to conduct an investigative stop.

¶7    5. Whether the District Court erred when it denied LeMay's motion to dismiss for lack of state criminal jurisdiction.

**Factual and Procedural Background**

¶8    LeMay moved to Fairview, Montana, in June 2009. He testified at his sentencing hearing that he loves to ride motorcycles and that he had hoped to open a repair shop in the area. According to LeMay, immediately upon moving to Fairview, he began to receive tickets from law enforcement officers who mistakenly believed he was part of a

2

motorcycle gang. He claims that in a matter of a few months, he received approximately 40 tickets for various offenses.

¶9 This appeal concerns various traffic and criminal offenses allegedly committed by LeMay on July 11 and 15, and August 26, 2009. The facts giving rise to each of these offenses, as reported in the Affidavit and Application for Permission to File an Information in each case, are detailed below.

**DA 10-0538 (District Court Cause No. DC 09-48)**

¶10 On July 11, 2009, Donna Goff of the Richland County Coalition Against Domestic Violence reported to law enforcement officers that an individual named Bryan was leaving threatening notes under the door of Laurie Ketterling at the Sunrise Inn in Sidney, Montana. Goff also reported that this Bryan rides a motorcycle. Later that evening, Ketterling twice called the Richland County Law Enforcement Center regarding LeMay. In the first call, Ketterling stated that LeMay was on his way to her room to physically harm her. In the second call, Ketterling reported that LeMay was outside her room.

¶11 When Sheriff's Deputy Michael Lange arrived on the scene, he saw LeMay pull out of the motel parking lot on his motorcycle. Lange conducted an investigative stop wherein he determined that LeMay was under the influence of alcohol. Because LeMay failed various field sobriety tests, he was arrested for Driving Under the Influence of Alcohol or Drugs (DUI) in violation of § 61-8-401, MCA. LeMay consented to provide a blood sample, which, upon testing by the state crime lab, revealed that his BAC was 0.14. Since it was determined that LeMay had five prior convictions for DUI between 1977 and 2002, this offense was charged as a felony.

3

**DA 10-0535 (District Court Cause No. DC 09-31)**

¶12 On July 15, 2009, Fairview Police Officer Richard Hollenbeck saw an individual on a motorcycle make an illegal U-turn as it left the Waterhole No. 3 Saloon. Officer Hollenbeck followed the motorcycle and made a traffic stop. Officer Hollenbeck noted at that time that the individual's pupils were pin-pointed, he smelled strongly of alcohol, he had trouble keeping his balance when he got off the motorcycle, and he had trouble finding his driver's license in his wallet. Eventually the individual produced a North Dakota driver's license identifying him as LeMay. Officer Hollenbeck administered a preliminary alcohol screening test which showed that LeMay's BAC was 0.185. LeMay was charged with felony DUI under § 61-8-401, MCA. In addition, the North Dakota Department of Transportation confirmed that LeMay did not have a Class M motorcycle license; thus he was also charged with Operating a Motorcycle Without Motorcycle Endorsement, a misdemeanor, in violation of § 61-5-102, MCA.

**DA 10-0536 (District Court Cause No. DC 09-39)**

¶13 On the evening of August 26, 2009, Officer Hollenbeck noticed a motorcycle driving without its lights, and traveling 37 mph in a 25 mph zone. When Officer Hollenbeck initiated a traffic stop, the motorcyclist identified himself as LeMay's son. Officer Hollenbeck cited him for speeding, operating without lights, operating without insurance, and displaying a suspended driver's license.

¶14 As Officer Hollenbeck was sitting in his patrol car writing the last citation, LeMay arrived at the scene and approached the patrol car. Officer Hollenbeck got out of the car. As he did so, he told LeMay that he was close enough and that he should stop. LeMay

4

refused and approached to within a foot of Officer Hollenbeck. Officer Hollenbeck ordered LeMay to back up, but again LeMay refused. Because LeMay was behaving in an agitated manner, Office Hollenbeck radioed for backup.

¶15 Officer Hollenbeck handed LeMay's son copies of the four citations, and told him that because the motorcycle's lights were defective, the motorcycle would have to be towed. LeMay began arguing with Officer Hollenbeck telling him that he could not tow his son's motorcycle. According to Officer Hollenbeck, LeMay used threatening, profane, and abusive language, and would not leave when instructed to do so.

¶16 When LeMay approached Officer Hollenbeck with his fists clenched, Officer Hollenbeck told LeMay that he was under arrest for obstructing a peace officer. Officer Hollenbeck instructed LeMay to turn around and place his hands in the small of his back, but LeMay refused. When Officer Hollenbeck attempted to place handcuffs on LeMay's wrists, LeMay jerked away from Officer Hollenbeck and attempted to pull something out of his right rear pocket, which Officer Hollenbeck believed to be a butterfly knife. After a struggle, Officer Hollenbeck managed to get the weapon away from LeMay and get him into the patrol car. At that time, Officer Hollenbeck identified the weapon as a pocket-sized Schrade multi-tool.

¶17 LeMay was charged with Disorderly Conduct, a misdemeanor, in violation of § 45-8-101, MCA; Obstructing a Peace Officer, a misdemeanor, in violation of § 45-7-302, MCA; Assault, a misdemeanor, in violation of § 45-5-201, MCA; Resisting Arrest, a misdemeanor, in violation of § 45-7-301, MCA; and Assault on a Peace Officer, a felony, in violation of § 45-5-210, MCA. The State later added a charge of Assault

5

with a Weapon, a felony, in violation of § 45-5-213, MCA, as an alternative for the charge of Assault on a Peace Officer.

¶18 Originally, Jeff Nehring acted as LeMay's counsel in all three cases, but eventually, the court appointed Ali Moulton to represent LeMay on the charges in Cause Nos. 09-39 and 09-48. Nehring continued to represent LeMay in Cause No. 09-31 regarding one felony DUI charge and the charge of failure to have the proper motorcycle endorsement. Nehring filed several motions which the District Court applied to all three cases. These motions included a motion to dismiss for lack of jurisdiction; a motion to dismiss for outrageous government conduct; and a motion to suppress for lack of particularized suspicion.

¶19 In the first motion, LeMay argued that he is Indian and that since Richland County is Indian Country, the State of Montana does not have jurisdiction over him. On the second motion regarding outrageous government conduct, LeMay claimed that based on the numerous tickets he has received since moving to Fairview, he is being racially profiled and illegally harassed by law enforcement officers. As to the third motion, pertaining specifically to Cause No. 09-31, LeMay argued that Officer Hollenbeck lacked particularized suspicion to perform an investigative stop because LeMay did not make an illegal U-turn as Officer Hollenbeck claimed. LeMay's motions were denied by the District Court in one-page orders.

¶20 On March 31, 2010, LeMay entered into a plea agreement wherein he agreed to plead nolo contendere to all of the charges while reserving his right to appeal. However, prior to sentencing, LeMay filed a motion to withdraw his nolo contendere pleas in all

6

three cases. Attached to his motion was a handwritten letter outlining the reasons he wished to withdraw his pleas. In his letter, LeMay claimed that during the scuffle with Officer Hollenbeck on August 26, 2009, Officer Hollenbeck slammed LeMay's head against the patrol car aggravating a prior brain injury. LeMay contends that because of this aggravated brain injury, he was unable to comprehend the legal proceedings. He further contends that he was not aware that he had pled guilty and that counsel must have entered a guilty plea on the charges without his consent. LeMay also claimed that his counsel and Officer Hollenbeck committed perjury, that the County Attorney's office had a conflict of interest, and that he was denied his right to a speedy trial.

¶21 Prior to the sentencing hearing on August 31, 2010, the District Court heard argument on LeMay's motion to withdraw his nolo contendere pleas. At that time, LeMay also informed the court that he was not happy with his legal representation. The court denied LeMay's motion to withdraw his pleas and ordered that the parties proceed with the sentencing hearing. LeMay objected and stated that he was not ready for sentencing as he thought his nolo contendere pleas would be withdrawn and that he was no longer represented by counsel. The court informed LeMay that it had not dismissed LeMay's attorneys and that they were still present in court and able to represent him. After inquiring of counsel whether they were prepared to cross-examine the State's witnesses, the court proceeded with sentencing.

¶22 On September 3, 2010, the District Court entered one combined written Judgment and Sentence for all three cases. For his felony convictions, the District Court sentenced LeMay to 13 months with the Department of Corrections (DOC) for placement in an

appropriate correctional facility or program followed by five years with DOC along with a $1,000 fine on each of his DUI convictions. The five years on each charge was suspended upon conditions. On his conviction for Assault with a Weapon, LeMay was sentenced to eight years with the DOC with all of that term suspended.

¶23 As to LeMay's misdemeanor convictions, LeMay was fined $500 on his convictions for both Assault and Obstructing a Peace Officer, and sentenced to six months in the Richland County jail on each charge with both terms suspended. On his conviction for Resisting Arrest, LeMay was sentenced to six months in the Richland County jail with all but 30 days suspended. On his conviction for Disorderly Conduct, LeMay was fined $100. And, on his conviction for Operating a Motor Vehicle without a Motorcycle Endorsement, LeMay was fined $85. In addition, the court ordered that LeMay's sentences on each of his convictions were to run concurrently.

¶24 LeMay now appeals the court's Judgment and Sentence.

**Issue 1.**

¶25 *Whether the District Court erred when it denied LeMay's motion to dismiss on the grounds of outrageous government conduct.*

¶26 LeMay argues on appeal that the District Court erred in denying his motion to dismiss on the grounds of outrageous government conduct because law enforcement officers illegally harassed and racially profiled him. LeMay asks this Court, as he did the District Court, to consider expanding the theory of outrageous government conduct to fit this case because, according to LeMay, all of his charges stem from illegal racial profiling.

8

*A. Standard of Review*

¶27 "The denial of a motion to dismiss in a criminal case presents a question of law which we review de novo." *State v. Roundstone*, 2011 MT 227, ¶ 11, 362 Mont. 74, 261 P.3d 1009 (quoting *State v. Knowles*, 2010 MT 186, ¶ 23, 357 Mont. 272, 239 P.3d 129).

*B. Discussion*

¶28 The United States Supreme Court first articulated the defense of outrageous government conduct in *United States v. Russell*, 411 U.S. 423, 93 S. Ct. 1637 (1973), wherein an undercover narcotics agent investigating the defendant and his confederates supplied the defendant with one of the ingredients necessary to manufacture methamphetamine. Although the ingredient was a legal substance, it was difficult to obtain. Based on evidence obtained by the narcotics agent, the defendant was convicted of three counts of unlawfully manufacturing and selling methamphetamine. *Russell*, 411 U.S. at 424-27, 93 S. Ct at 1639-40. The United States Court of Appeals for the Ninth Circuit reversed the conviction concluding as a matter of law that a defense to a criminal charge may be founded upon "an intolerable degree of governmental participation in the criminal enterprise." *Russell*, 411 U.S. at 424, 93 S. Ct at 1639. Thereafter, the Supreme Court reversed the Court of Appeals stating:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed.

*Russell*, 411 U.S. at 431-32, 93 S. Ct at 1643 (internal citation omitted).

9

¶29 Since the Supreme Court's decision in *Russell*, both state and federal courts have limited the defense of outrageous government conduct to "extreme cases in which the government essentially manufactured the crime or generated new crimes merely for the sake of pressing criminal charges against the defendant." *State v. Ditton*, 2006 MT 235, ¶ 34, 333 Mont. 483, 144 P.3d 783 (citing *State v. Williams-Rusch*, 279 Mont. 437, 445, 928 P.2d 169, 174 (1996) *overruled in part on other grounds by City of Billings v. Bruce*, 1998 MT 186, 290 Mont. 148, 965 P.2d 866).

¶30 The allegedly outrageous government conduct in this case centers on LeMay's claims that he was harassed by law enforcement officers because they mistakenly believed that LeMay was a white supremacist and a member of an outlaw biker gang. It is on that basis that LeMay argues that he was racially profiled.

¶31 " 'Racial profiling' means the detention, official restraint, or other disparate treatment of an individual solely on the basis of the racial or ethnic status of the individual." Section 44-2-117(8)(c), MCA. This statute prohibits racial profiling by law enforcement officers. It provides, in part:

> (2) The race or ethnicity of an individual may not be the sole factor in:
> (a) determining the existence of probable cause to take into custody or arrest an individual; or
> (b) constituting a particularized suspicion that an offense has been or is being committed in order to justify the detention of an individual or the investigatory stop of a motor vehicle.
> (3) Each law enforcement agency shall adopt a policy on race-based traffic stops that:
> (a) prohibits the practice of routinely stopping *members of minority groups* for violations of vehicle laws as a pretext for investigating other violations of criminal law . . . .

10

Section 44-2-117, MCA (emphasis added). In addition, § 44-2-117(8)(a), MCA, defines a "minority group" as an individual of "African American, Hispanic, Native American, Asian, or Middle Eastern descent."

¶32 In this case, although LeMay is Native American, he does not base his claim of racial profiling on his Native American heritage. Instead, he claims that he was racially profiled because law enforcement officers believed him to be a white supremacist and a member of a biker gang. To demonstrate that, LeMay refers to a letter introduced at sentencing written by Officer Hollenbeck wherein that officer notes that "[t]here have been numerous unconfirmed reports that Lemay [sic] is a White Supremacist, and also involved with the Banditos Motorcycle Gang." These, however, are not minority groups that § 44-2-117, MCA, was designed to protect. And, contrary to his claim that he was profiled because he is a biker, the deputy county attorney pointed out that of the three members of the Fairview Police Department, two of the officers are themselves bikers.

¶33 Moreover, LeMay does not claim that any government agent participated in or manufactured any of the criminal activity which led to his charges or convictions, nor does he claim that any government agent generated new crimes merely for the sake of pressing criminal charges against him. LeMay never ties his conduct of riding his motorcycle with a BAC of 0.14 in one instance and 0.185 in another instance, or his riding his motorcycle without a motorcycle endorsement, to any alleged police misconduct. Furthermore, he has failed to show that the alleged police misconduct violated his constitutional rights relating to the crimes charged.

11

¶34    LeMay contends that the State should be barred from prosecuting him based on law enforcement's outrageous actions.  However, the United States Court of Appeals for the Ninth Circuit has held that prosecution should be barred " 'only when the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice.' "  *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir. 1983) (quoting *United States v. Ryan*, 548 F.2d 782, 789 (9th Cir. 1976), *cert denied*, 430 U.S. 965, 97 S. Ct. 1644 (1977)).  That is not the case here.

*C. Conclusion*

¶35    We conclude that LeMay has not demonstrated outrageous conduct in accordance with the above principles.  Accordingly, we hold that the District Court did not err when it denied LeMay's motion to dismiss on the grounds of outrageous government conduct.

**Issue 2.**

¶36    *Whether LeMay received ineffective assistance of counsel.*

¶37    LeMay contends that both of his counsel failed to provide him with effective assistance because they failed to investigate the case against him or his assertions that he was being racially profiled and illegally harassed by the law enforcement community in Fairview.

*A. Standard of Review*

¶38    A defendant's claim of ineffective assistance of counsel constitutes mixed questions of law and fact which this Court reviews de novo.  *Whitlow v. State*, 2008 MT 140, ¶ 9, 343 Mont. 90, 183 P.3d 861 (citing *State v. Racz*, 2007 MT 244, ¶ 13, 339 Mont. 218, 168 P.3d 685).

12

*B. Discussion*

¶39　The Sixth and Fourteenth Amendments to the United States Constitution and Article II, Section 24 of the Montana Constitution guarantee individuals the right to counsel in criminal prosecutions. We have adopted the two-part test articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), to analyze ineffective assistance of counsel claims. Under that test, a defendant must prove (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defense. *Whitlow*, ¶ 10 (citing *Racz*, ¶ 22).

¶40　A defendant must satisfy both prongs of the *Strickland* test to prevail on an ineffective assistance of counsel claim. *Whitlow*, ¶ 11 (citing *Adams v. State*, 2007 MT 35, ¶ 22, 336 Mont. 63, 153 P.3d 601). Hence, if a defendant makes an insufficient showing regarding one prong of the test, there is no need to address the other prong. *Whitlow*, ¶ 11 (citing *Adams*, ¶ 22; *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069).

¶41　We clarified in *Whitlow* that the proper standard for evaluating defense counsel's performance is to determine whether counsel's conduct fell below an objective standard of reasonableness measured under prevailing professional norms and in light of the surrounding circumstances. *Whitlow*, ¶¶ 12, 20. We also clarified in *Whitlow* that the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and is based on sound trial strategy still remains. *Whitlow*, ¶ 21. "To establish prejudice, the defendant must show 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' "

13

*State v. Howard*, 2011 MT 246, ¶ 22, 362 Mont. 196, ___ P.3d ___ (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068).

¶42 Claims of ineffective assistance of counsel are appropriate for consideration on direct appeal when they are capable of resolution by examining the record alone. *Howard*, ¶ 21 (citing *In re Petition of Hans*, 1998 MT 7, ¶ 41, 288 Mont. 168, 958 P.2d 1175). To make this determination, we must ask why counsel did or did not perform as alleged, and if the record explains why, we will address the issue on direct appeal. *Howard*, ¶ 21 (citing *State v. Kougl*, 2004 MT 243, ¶ 14, 323 Mont. 6, 97 P.3d 1095) (quotation marks omitted).

¶43 Because the record in the case *sub judice* explains why counsel acted as they did, we are able to address this issue on direct appeal. We note first that LeMay's belief that his counsel provided ineffective assistance because they failed to pursue a claim of outrageous government conduct ignores the fact that counsel did pursue such a claim by filing a motion to dismiss and lengthy supporting brief. The reasons counsel did not go further in pursuing that claim are explained in the transcript of the April 5, 2010 change of plea hearing.

¶44 During that hearing, the District Court asked LeMay whether he had any communication problems with his attorneys. LeMay responded that he did have problems as he had "a different reality about how the defense should be presented." He maintained that he had asked not only his attorneys, but the deputy county attorney to investigate his claims. When the court asked counsel for clarification, Nehring replied that LeMay was referring to Officer Hollenbeck who was the arresting officer on two of

14

the three criminal matters involving LeMay and that LeMay wanted Officer Hollenbeck's conduct investigated. When the court asked Nehring if he had any communication problems with his client, Nehring responded:

> Obviously, Mr. LeMay has made some requests that as an attorney I think it's more appropriate for an investigating agency to look into other than myself, and that's where I believe some of the reference of miscommunication is that he would like me to do things that I don't really see as my role as the attorney . . . ."

When asked the same question by the court, Moulton agreed with Nehring's assessment of the problem.

¶45 T. R. Halvorson, the deputy county attorney, added the following regarding LeMay's claim of outrageous government conduct:

> [LeMay would] like to have that investigated and he's trying to communicate that it is broader than just Officer Richard Hollenbeck. There are others certainly in that Department, maybe elsewhere in the government in Fairview besides the police department. I think that's what he's trying to get across. As far as I can see, they are not impediments to his pleading or carrying out his agreement, and these investigations can go forward, and in a meeting that he and Mr. Nehring and I had back when Mr. Nehring was the attorney for him on all three cases we met in my office; we looked on the web site of the attorney general; we showed [LeMay] where the Criminal Investigation Bureau contact information is. That's the outlet that I was aware of that he could be referred to; whether he's done that or not, I don't know, but we did try to help him find where he could do this with an independent investigation.

¶46 Halvorson made similar statements prior to the sentencing hearing when the District Court heard argument on LeMay's motion to withdraw his nolo contendere pleas. At that time, Halvorson stated the following regarding a discussion that occurred during one of the plea negotiation meetings with LeMay and his counsel:

15

I found the page of the Montana Department of Justice website for the Criminal Investigation Bureau where a person could make a complaint or request an investigation when it appears that local authorities for some reason are not doing what they should. I printed that page out and in the presence of Mr. Nehring and gave him that page. I said that because I'm part of the local government that you distrust it's not going to settle your mind if I investigate Officer Hollenbeck and decide that he didn't do anything wrong. . . . You go to this centralized Department of Justice Bureau and it's better to have them investigate from the outside, so I gave him that. . . . I said there's your on ramp if you want to get an investigation of Officer Hollenbeck, and it appeared that then he was satisfied and he had no more complaints that I wasn't investigating Hollenbeck or Mr. Nehring wasn't investigating Hollenbeck or Ms. Moulton wasn't investigating Hollenbeck.

¶47 Even if counsel were able to do more to investigate LeMay's claims of outrageous government conduct, it would not have changed the fact that LeMay drove his motorcycle with a BAC of 0.185 in one instance and 0.14 in another instance, or that he did not have a motorcycle endorsement on his driver's license.

*C. Conclusion*

¶48 Based on the foregoing, we conclude that LeMay has failed to demonstrate that his counsels' conduct fell below an objective standard of reasonableness, or that there was a reasonable probability that, but for counsels' allegedly unprofessional errors, the result of the proceeding would have been different. Accordingly, we hold that both Nehring's and Moulton's assistance was reasonable considering all the circumstances.

**Issue 3.**

¶49 *Whether the District Court erred when it denied LeMay's motion to withdraw his nolo contendere pleas.*

¶50 LeMay argues that his nolo contendere pleas were not made knowingly or voluntarily because he is suffering from a traumatic brain injury that affected his

16

comprehension of the proceedings. LeMay also argues that he should be allowed to withdraw his pleas because he received ineffective assistance of counsel when counsel failed to investigate the case against him or his assertions that he was being racially profiled and illegally harassed.

*A. Standard of Review*

¶51 We review a district court's denial of a motion to withdraw a guilty plea de novo, because the issue of whether a defendant entered a plea voluntarily is a mixed question of law and fact. *State v. Robinson*, 2009 MT 170, ¶ 10, 350 Mont. 493, 208 P.3d 851 (citing *State v. Swensen*, 2009 MT 42, ¶ 9, 349 Mont. 268, 203 P.3d 786).

*B. Discussion*

¶52 A court may for good cause permit a defendant to withdraw a plea of guilty and substitute a not guilty plea. *State v. McFarlane*, 2008 MT 18, ¶ 11, 341 Mont. 166, 176 P.3d 1057 (citing § 46-16-105(2), MCA). "Good cause" includes the involuntariness of the plea, but it may also include other criteria such as claims of ineffective assistance of counsel. *McFarlane*, ¶ 11 (citing *State v. Warclub*, 2005 MT 149, ¶ 17, 327 Mont. 352, 114 P.3d 254; *Hans v. State*, 283 Mont. 379, 410, 942 P.2d 674, 693 (1997), *overruled in part and on other grounds by Whitlow v. State*, 2008 MT 140, 343 Mont. 90, 183 P.3d 861). We stated in *McFarlane* that

> "[w]here a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases."

*McFarlane*, ¶ 11 (quoting *Hans*, 283 Mont. at 411, 942 P.2d at 693).

17

¶53    Relying on *Brady v. United States*, 397 U.S. 742, 90 S. Ct. 1463 (1970), we also

stated in *McFarlane*:

> "[W]e will not overturn a district court's denial of a motion to withdraw a guilty plea if the defendant was aware of the direct consequences of such a plea, and if his plea was not induced by threats, misrepresentations, or an improper promise such as a bribe." *Warclub*, ¶ 32. When determining if a defendant entered a plea voluntarily and whether a district court erred in denying a motion to withdraw a plea, we examine "case-specific considerations." These considerations include the adequacy of the district court's interrogation, the benefits obtained from a plea bargain, the withdrawal's timeliness, and other considerations that may affect the credibility of the claims presented. *State v. Muhammad*, 2005 MT 234, ¶¶ 14, 24, 328 Mont. 397, 121 P.3d 521.

*McFarlane*, ¶ 17.

¶54    In this case, the record from the April 5, 2010 change of plea hearing

indicates that the District Court explained to LeMay what a nolo contendere plea entailed

and LeMay indicated that he understood.

> THE COURT: Okay. I understand that you're going to be pleading nolo contendere, but do you understand that even pleading nolo contendere under the eyes of the law is viewed as if you pled guilty?
>
> .    .    .
>
> THE COURT: You won't have to explain to me what you did that makes you believe you are guilty of any offense to which you plead guilty, but after entering a plea of nolo contendere, other people looking at what happened here today will treat it, treat you, as if you are guilty of the offenses to which you enter a plea of nolo contendere. Do you understand that?
> [LeMay]: Yeah, yes I do.

¶55    The record also reveals that the court thoroughly questioned LeMay before

accepting his nolo contendere pleas on each charge. Hence, we conclude that LeMay was

well aware of the consequences of his nolo contendere pleas.

18

¶56 In addition, LeMay failed to provide any medical evidence to support his contention that the scuffle with Officer Hollenbeck aggravated LeMay's prior brain injury and affected his comprehension of the proceedings. Furthermore, prior to the sentencing hearing, when the District Court heard argument on LeMay's motion to withdraw his pleas, Halvorson, the deputy county attorney, pointed out that LeMay "was himself personally present and verbally participating in the give and exchange" regarding extensive plea negotiations "that lasted for hours." Halvorson also stated regarding those plea negotiations that

> [LeMay] was engaged. In fact, he raised contentions and issues himself at these meetings that the attorneys didn't raise that provided the State with reasons to give him the considerations you see in these [Plea] Agreements. This is kind of an unusual Agreement you're looking at here for this district, but he gave reasons that motivated the State to accept that we should give him these considerations. He knew exactly what he wanted and he understood how to get it. He was effective in his participation and in fact obtained the considerations.

*C. Conclusion*

¶57 We conclude that LeMay understood the consequences of his nolo contendere pleas and that he failed to establish good cause to support withdrawal of those pleas. Accordingly, we hold that LeMay's nolo contendere pleas were voluntarily entered and we affirm the District Court's denial of his motion to withdraw his pleas.

**Issue 4.**

¶58 *Whether the District Court erred when it denied LeMay's motion to suppress for lack of particularized suspicion to conduct an investigative stop.*

¶59 LeMay contends that the District Court erred in denying his motion to suppress because, according to LeMay, he did not make an illegal U-turn; thus Officer Hollenbeck

19

did not have sufficient facts to form a particularized suspicion of wrongdoing to conduct an investigative stop.

*A. Standard of Review*

¶60 We review the denial of a motion to suppress to determine whether the lower court's findings were clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Flynn*, 2011 MT 48, ¶ 6, 359 Mont. 376, 251 P.3d 143 (citing *State v. Larson*, 2010 MT 236, ¶ 15, 358 Mont. 156, 243 P.3d 1130). Findings of fact are clearly erroneous if they are not supported by substantial credible evidence, if they are based upon a misapprehension of the evidence or if our review of the record convinces us that a mistake has been made. *Flynn*, ¶ 6, (citing *Weer v. State*, 2010 MT 232, ¶ 7, 358 Mont. 130, 244 P.3d 311).

*B. Discussion*

¶61 Both the Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect individuals from unreasonable searches and seizures. These constitutional protections extend to investigative stops of vehicles by law enforcement officers. *Flynn*, ¶ 7 (citing *Larson*, ¶ 19). Under Montana law,

> [i]n order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

Section 46-5-401(1), MCA.

¶62 Hence, to establish particularized suspicion for a stop, the State must show that the officer possessed (1) objective data and articulable facts from which the officer can make

20

certain reasonable inferences, and (2) a resulting suspicion that the person to be stopped has committed, is committing, or is about to commit an offense. *Brown v. State*, 2009 MT 64, ¶ 20, 349 Mont. 408, 203 P.3d 842. "Whether particularized suspicion exists is evaluated under the totality of the circumstances and requires consideration of the quantity or content of the information available to the officer and the quality or degree of reliability of that information." *City of Missoula v. Moore*, 2011 MT 61, ¶ 16, 360 Mont. 22, 251 P.3d 679 (citing *State v. Rutherford*, 2009 MT 154, ¶ 12, 350 Mont. 403, 208 P.3d 389).

¶63 We pointed out in *Flynn* that when we first adopted the particularized suspicion standard for vehicular stops, we recognized that the inquiry turned on what the officer knew, observed, inferred, and ultimately suspected, not what the defendant later testified to. *Flynn*, ¶ 12 (citing *State v. Gopher*, 193 Mont. 189, 193-94, 631 P.2d 293, 296 (1981)). Thus, we stated in *Flynn* that

> [a] defendant's subsequent, valid explanation for conduct that objectively appeared suspicious may affect his or her ultimate liability for a charged offense, but it cannot affect the validity of a stop properly based on particularized suspicion. The particularized suspicion inquiry is a fact based assessment of the objective quantity, content and reliability of information available to the officer. An officer in the field need not consider every possible innocent explanation or legal exception before concluding that particularized suspicion exists.

*Flynn*, ¶ 11 (internal citations and quotation marks omitted).

¶64 In this case, Officer Hollenbeck stopped LeMay on Montana State Highway No. 200, a north-south road known as Ellery Avenue in the town of Fairview. Officer Hollenbeck stopped LeMay for making an illegal U-turn after he observed LeMay on his

motorcycle in the northbound lane of Ellery Avenue drive across the double-yellow center line then turn left into the southbound lane.

¶65 LeMay argues that he did not make an illegal U-turn because he was not northbound on Ellery Avenue prior to crossing the double-yellow center line. LeMay maintains that his motorcycle was parked with the rear wheel against the curb; thus when he drove from his parked position across the double-yellow center line of Ellery Avenue he was proceeding west prior to turning left into the southbound lane.

¶66 However, LeMay conceded that he crossed the two-lane divided roadway and travelled through the double yellow lines to make a left-hand turn. This by itself was an unusual turn or movement sufficient to establish particularized suspicion. In *Weer*, we held that particularized suspicion for an investigative stop existed where the officer testified he saw the defendant swerve within his own lane and drive onto, but not over, the double-yellow center line on a two-lane highway. *Weer*, ¶¶ 19-20.

¶67 LeMay cites to § 61-8-328(4), MCA, to support his contention that he did not perform an illegal U-turn. Section 61-8-328(4), MCA, provides that it is not a violation of the law for a person to "turn a vehicle left across a lane marked with two yellow lines into a public or private parking lot, private road, private driveway, or roadway if the turn can be made safely and if the person does not hinder the flow of oncoming traffic." That is not what LeMay was doing, however. The undisputed facts in this case show that LeMay was not turning "*into* a public or private parking lot, private road, private driveway, or roadway [emphasis added]." Rather, he was turning wholly upon and within Ellery Avenue. LeMay made a turn resulting in his making a 180-degree change

of direction from the lawful direction where he started, i.e., he reversed from northbound to southbound by crossing the double-yellow center line.

¶68 Moreover, LeMay acknowledged that several "No U-turn" signs were posted throughout Ellery Avenue. A statutory or city ordinance violation alone establishes a particularized suspicion for a valid investigative stop. *See Rutherford*, ¶¶ 11-12.

## *C. Conclusion*

¶69 We conclude that based on the totality of the circumstances, Officer Hollenbeck had sufficient facts to form a particularized suspicion of wrongdoing to initiate an investigative stop. Accordingly, we hold that the District Court did not err when it denied LeMay's motion to suppress.

## **Issue 5.**

¶70 *Whether the District Court erred when it denied LeMay's motion to dismiss for lack of state criminal jurisdiction.*

¶71 LeMay contends that the District Court erred in denying his motion to dismiss for lack of state criminal jurisdiction because he is Indian and Richland County is Indian Country. Hence, he maintains that his alleged crimes are covered by federal law thereby divesting the State of Montana of jurisdiction.

## *A. Standard of Review*

¶72 We review a district court's ruling on a motion to dismiss for lack of subject matter jurisdiction de novo. *In re Estate of Big Spring*, 2011 MT 109, ¶ 20, 360 Mont. 370, 255 P.3d 121 (citing *Cooper v. Glaser*, 2010 MT 55, ¶ 6, 355 Mont. 342, 228 P.3d 443). A district court must determine whether the complaint states facts that, if true,

would vest the court with subject matter jurisdiction. *Big Spring*, ¶ 20 (citing *Meagher v. Butte-Silver Bow City-County*, 2007 MT 129, ¶ 13, 337 Mont. 339, 160 P.3d 552). The district court's determination is a conclusion of law that we review for correctness. *Big Spring*, ¶ 20 (citing *Zempel v. Liberty*, 2006 MT 220, ¶ 11, 333 Mont. 417, 143 P.3d 123).

*B. Discussion*

¶73  In *LaPier v. McCormick*, 986 F.2d 303 (9th Cir. 1993), the United States Court of Appeals for the Ninth Circuit determined that "Indian country criminal jurisdiction is allocated among federal, state, and tribal courts depending on the subject matter of the crime, the persons involved in the crime, and the locus of the crime." *LaPier*, 986 F.2d at 304 (citations and internal quotation marks omitted).

¶74  In the instant case, it is not necessary for this Court to determine whether LeMay is affiliated with a particular Tribe since his claim of lack of state criminal jurisdiction fails based on the locus of his crimes. Most of LeMay's crimes at issue in this appeal occurred in the town of Fairview (one DUI occurred in Sidney). Both Fairview and Sidney are in Richland County, Montana. In its brief opposing LeMay's motion, the State provided ample evidence via maps, town plats and certificates of survey to show that the town of Fairview is an independently incorporated city of the State of Montana.

¶75  Furthermore, we determined long ago that "no part of Richland County lies within the boundaries of 'Indian Country' . . . ." *In re Diserly*, 140 Mont. 219, 220, 370 P.2d 763, 763 (1962). Like LeMay, the defendant in *Diserly* was apprehended in Fairview. He entered a plea of guilty to the crime of forgery in the District Court and was sentenced

to a term in the Montana State Prison.  The defendant in *Diserly* subsequently petitioned this Court for habeas corpus alleging that he was an Indian ward attached to the Fort Peck Indian Reservation and that his conviction was illegal because the State did not have criminal jurisdiction over him regardless of the location of the crime charged.  We disagreed and denied his petition.  *Diserly*, 140 Mont. at 220, 370 P.2d 763.

## C. Conclusion

¶76    Whether or not LeMay is affiliated with a federally recognized Tribe, his crimes were not committed within Indian Country as he alleged.  Accordingly we hold that the District Court did not err when it denied LeMay's motion to dismiss for lack of state criminal jurisdiction.

¶77    Affirmed.


/S/ JAMES C. NELSON


We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ BRIAN MORRIS
/S/ MICHAEL E WHEAT
/S/ JIM RICE