FILED

02/24/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0306

DA 23-0306

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 31

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

DARRIN WILLIAM MATT,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DC-22-285
Honorable Molly Owen, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Tammy A. Hinderman, Appellate Defender, Deborah S. Smith, Assistant Appellate Defender, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Mardell Ployhar, Assistant Attorney General, Helena, Montana

            James Lapotka, Lake County Attorney, Brendan McQuillan, Deputy County Attorney, Polson, Montana

Submitted on Briefs:  November 19, 2025

Decided:  February 24, 2026

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Darrin William Matt ("Matt") appeals the April 5, 2023 Judgment entered in the Twentieth Judicial District Court, Lake County, sentencing him to 24 years in the Montana State Prison for felony Assault on a Peace Officer in violation of § 45-5-210, MCA. We affirm in part, and vacate and remand in part for resentencing.

¶2 We restate the dispositive issues on appeal as follows:[1]

*Issue One: Whether the District Court illegally sentenced Matt for exercising his constitutional rights.*

*Issue Two: Whether this Court should exercise plain error review to consider Matt's claim that alleged police misconduct violated his right to due process.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 At 7:30 a.m. on September 8, 2022, Matt was incarcerated in the detention facility of the Confederated Salish and Kootenai Tribes ("CSKT" or "Tribes"). Matt experiences severe mental health disorders for which he is prescribed several medications. Zane Bundy ("Bundy"), a CSKT detention officer, was due to administer Matt's prescribed medication at 9:00 a.m. Alone in a cell and without these medications, Matt became "distraught" and "upset." Bundy could hear Matt "yelling" for his medication.

¶4 Previously, detention center staff had provided Matt with cleaning supplies for his cell. When Bundy approached Matt to retrieve those shortly before 9:00 a.m., Matt threw water in his face. As revealed by surveillance footage played for the jury at trial, Bundy

---

[1] Matt also asks this Court to strike the imposition of fees and fines. Because we vacate his sentence and remand for resentencing, we need not address whether the District Court properly assessed financial obligations in the instant case.

then put Matt into a hold on the floor of his cell. The two men scuffled on the floor until three additional detention officers arrived to assist Bundy. One detention officer tased Matt twice as two more detention officers arrived. At this point, Matt became docile and officers handcuffed him before transporting him to a solitary concrete block cell in the facility. Once in this cell and still without his medications, Matt began hurting himself by hitting his head against the concrete wall twice.

¶5      CSKT police captain Louis Fiddler would testify the jail relied on a "restraint chair" as the only intervention option when an inmate is self-harming. Officers entered Matt's temporary cell with the chair and asked him to sit; Matt initially complied and officers were able to strap his arms, shoulders, and left leg to the chair. Bundy, as part of the assembled team fitting Matt into the restraint chair, attempted to secure Matt's right leg. Matt then kicked Bundy in the left cheek with his unrestrained leg. Although Bundy did not seek medical treatment for the injury, he said his jaw hurt and eating was painful for several weeks afterward. According to Fiddler, three officers had been injured in a similar manner when trying to secure other inmates to the restraint chair that summer. Officers managed to fully restrain Matt and position his chair toward the wall. Bundy placed a spit hood over Matt's head after he spat on an officer. Left alone in the cell, Matt spent several minutes struggling against the restraints.

¶6      The State charged Matt with assault on a peace officer by Information and filed notice of its intention to seek a persistent felony offender designation. Following a one-day trial on February 6, 2023, a jury convicted Matt. At sentencing, the State recommended incarcerating Matt for 24 years while Matt's attorney requested a five-year sentence, noting

3

the average sentence for assault on a peace officer is four-and-a-half years. Matt spoke of his progress with the CSKT Tribal Reentry Program to meet his substance and mental health treatment needs as well as finding assistance securing stable housing and employment. He additionally apologized for past disrespect.

¶7     The District Court pronounced Matt's sentence and the reasons for the sentence:

> All right, Mr. Matt, we had a jury trial in this matter, and you wasted everyone's time. There was a video of this incident. It was very clear to everyone, including the jury, that you were guilty of assault on a peace officer. I don't think the jury deliberated very long at all because it was—we saw it as clear as day. There was video.
>
> So again, you wasted jurors' time, you wasted the [c]ourt's time, you wasted the State's time, your attorney's time, all the taxpayers who had to pay for all this.
>
> In your [Presentence Investigation Report ("PSI")], you stated what reason do you have for your involvement in this offense. You said, Officer abuse of prisoner, which there was no evidence of. Again, it was very clear that you assaulted this officer.
>
> I realize that, like [Defense Counsel] said, punishment—or sentencing is meant to prevent, deter, and rehabilitate. The State of Montana has already spent 30 years, almost, trying to rehabilitate you and it hasn't worked and it's not going to work anymore.
>
> So, you failed to take responsibility for what you did. You assaulted a peace officer. You've had an extremely poor history on supervision and at the Department of Corrections. You're rated very high as a risk to reoffend, the highest that's possible.
>
> Again, the State of Montana and tax payers [SIC] have already expended a significant amount of money trying to rehabilitate you. So for that, having been found guilty of assault on a peace officer, sentence is as imposed as follows . . . .

The District Court then sentenced Matt to the Montana State Prison for 24 years, with no time suspended, and assessed fees and fines. Matt now appeals.

4

## STANDARD OF REVIEW

¶8 This Court reviews a criminal sentence for legality. *State v. Villalobos*, 2024 MT 301, ¶ 7, 419 Mont. 256, 560 P.3d 617. We exercise plenary review of constitutional questions. *City of Kalispell v. Salsgiver*, 2019 MT 126, ¶ 11, 396 Mont. 57, 443 P.3d 504.

¶9 In general, this Court will not review an issue raised for the first time on appeal. *State v. Favel*, 2015 MT 336, ¶ 13, 381 Mont. 472, 362 P.3d 1126; *State v. Kotwicki*, 2007 MT 17, ¶ 8, 335 Mont. 344, 151 P.3d 892. However, when a defendant's fundamental rights are invoked, we may invoke the common law plain error doctrine when failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. *Favel*, ¶ 13.

## DISCUSSION

¶10 *Issue One: Whether the District Court illegally sentenced Matt for exercising his constitutional rights.*

¶11 On appeal, Matt argues the presiding judge's comments during sentencing that alleged he had "wasted" time of the Court, the State, and his attorney as well as wasting taxpayer money when video evidence demonstrated Matt's guilt "clear as day" rendered his sentence illegal because he was punished for exercising his fundamental rights to a jury trial, remain silent, and maintain his innocence.

¶12 The United States Constitution and the Montana Constitution guarantee the right to due process. U.S. Const. amend. V; U.S. Const. amend. XIV; Mont. Const. art. II, § 17. A criminal defendant's sentence must comport with those due process guarantees. *State v.*

5

*Haldane*, 2013 MT 32, ¶ 40, 368 Mont. 396, 300 P.3d 657. A court violates due process by punishing a person for exercising a constitutional right. *State v. Shreves*, 2002 MT 333, ¶ 14, 313 Mont. 252, 60 P.3d 991 (citing *State v. Kelly*, 265 Mont. 298, 301, 876 P.2d 641, 644 (1994)). Thus, a sentence imposed in violation of a defendant's due process rights is illegal.

¶13 Matt possessed an unequivocable right to remain silent and not incriminate himself. "No person shall be compelled to testify against himself in a criminal proceeding." Mont. Const. art. II, ¶ 25; *see also* U.S. Const. amend. V (No person "shall be compelled in any criminal case to be a witness against himself"); *Shreves*, ¶ 10. The State carries the burden of proving each element of a charged offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970); *State v. Mills*, 2018 MT 254, ¶ 24, 393 Mont. 121, 428 P.3d 834 (citations omitted). The right to remain silent "extends beyond trial to those already convicted of crime and applies to punishment as well as the determination of guilt." *Shreves*, ¶ 14 (citing *Estelle v. Smith*, 451 U.S. 454, 462-63, 101 S. Ct. 1866, 1872-73 (1981)). Further, Matt is guaranteed the constitutional right to a trial by jury. U.S. Const. amend. VI; U.S. Const. amend. XIV; Mont. Const. art. II, §§ 24, 26. These constitutional guarantees indisputably entitled Matt to a jury trial to determine his guilt beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 477, 120 S. Ct. 2348, 2356 (2000); *Salsgiver*, ¶ 14.

¶14 Matt did not testify at trial. He contributed a statement in his PSI in which he said the reason for the offense was "[o]fficer abuse of prisoner." At sentencing, he apologized for any disrespect to the court and described his intention to avail himself of the Tribes'

6

reentry program to assist him with issues related to chemical dependency and mental health, as well as secure stable housing and employment. Contrary to the State's argument at sentencing that Matt relied on a theory at trial that his actions were justified, Matt's theory at trial was that there was insufficient evidence to support a jury finding of bodily injury, regardless of the video evidence. His attorneys pursued this theory when cross-examining the State's witnesses and at closing.

¶15 The District Court's oral pronouncement of Matt's sentence began by admonishing his failure to "take responsibility" for his actions and "wast[ing]" the time of the various parties involved in pursuit of a trial. "So for that," the court then pronounced Matt's sentence. The written judgment differed from the oral pronouncement by omitting the references to Matt's choices to not testify at trial and try his case before a jury. Nonetheless, the oral pronouncement controls. *State v. Garcia*, 2011 MT 130, ¶ 12, 360 Mont. 537, (citing *State v. Rennaker*, 2007 MT 1, ¶ 48, 335 Mont. 274, 150 P.3d 960).

¶16 The District Court considered several different factors as the reasons for Matt's sentence, including those enumerated in the written sentence, but the emphasis on his constitutionally protected right against self-incrimination and right to a jury trial during the oral pronouncement merits the scrutiny of this Court on appeal. Indeed, our caselaw is replete with examples of vacating sentences imposed in violation of the right to remain silent. *See Shreves*, ¶ 20; *Rennaker*, ¶ 50; *State v. Cesnik*, 2005 MT 257, ¶ 25, 329 Mont. 63, 122 P.3d 456; *State v. Imlay*, 249 Mont. 82, 91, 813 P.2d 979, 985 (1991).

¶17 In *Shreves*, the defendant maintained his innocence throughout the trial and sentencing stages of the proceedings. *Shreves*, ¶¶ 14, 20. The district court's sentence was

7

based "in large part" on his refusal to explain his crime or signal "remorse" for the offense. *Shreves*, ¶ 20. The narrow prohibition on inferring, without evidence in the record, a lack of remorse in situations where the defendant maintained his innocence at sentencing protects against "the Hobson's choice" of abandoning the right to remain silent or suffering "the imposition of a greater sentence." *Shreves*, ¶¶ 22, 23. Compelling a defendant to do so "is constitutionally impermissible." *Shreves*, ¶ 23. Similarly in *Cesnik*, we vacated a sentence based in part on the district court's dismay at the defendant's "refusal to acknowledge the jury's verdict" by accepting "responsibility for his acts." *Cesnik*, ¶ 24. "Given that Cesnik had consistently maintained his innocence and had a right to appeal his conviction, such an admission would have undermined his constitutionally protected right not to incriminate himself and rendered his appeal meaningless." *Cesnik*, ¶ 24.

¶18 Although a court is "permitted to sentence a defendant based on lack of remorse so long as there is affirmative evidence of the lack of remorse[,]" we will not uphold a sentence "where a district court draws a negative inference of lack of remorse as a result of a defendant's invocation of his constitutional right to remain silent and refusal to admit guilt." *State v. Morris*, 2010 MT 259, ¶ 22, 358 Mont. 307, 245 P.3d 512 (citing *Rennaker*, ¶ 51; *Shreves*, ¶ 22).

¶19 Here, we conclude the District Court's comments similarly undermined the legality of Matt's sentence because the court premised his sentence on his "fail[ure] to take responsibility" for a crime for which Matt maintains his innocence. Like *Shreves* and *Cesnik*, Matt maintained innocence and exercised his right against self-incrimination and right to have a jury decide his fate. Although the State argues the video evidence clearly

8

demonstrated Matt's guilt, Matt maintained his own defensive theory through sentencing. The comments from the District Court clearly suggest the sentence was levied in large part due to Matt's refusal to admit his crime. This runs afoul of the narrow rule enunciated in *Shreve*, ¶ 22. The District Court premised Matt's sentence on his lack of responsibility despite him maintaining his innocence, thus his sentence is constitutionally infirm and must be vacated.

¶20 Matt also challenges the District Court's comments regarding his decision to exercise his right to a jury trial, making an argument analogous to the infringement of his right against self-incrimination. In response, the State cites *Fitzpatrick v. State*, 733 S.E.2d 46 (Ga. 2012). There, the Georgia trial court issued a nearly verbatim reproach of the defendant at sentencing following his conviction for burglary, noting the significance of video evidence and taking up the "time" of the court and jury. *Fitzpatrick*, 733 S.E.2d at 51. Unlike the instant case, Fitzpatrick had testified at trial and his testimony "defie[d] belief." *Fitzpatrick*, 733 S.E.2d at 51. A jury had examined the facts presented by Fitzpatrick and nonetheless convicted him. *Fitzpatrick*, 733 S.E.2d at 51. Such a situation is inapposite to the situation here, where Matt did not testify and maintained the State's case against him was insufficient. Just as with the statements regarding Matt's "fail[ure] to take responsibility" for his conduct, the District Court's statements regarding Matt wasting the jury's time impermissibly premised Matt's sentence on a frustration with Matt exercising his constitutional right to a trial by jury.

¶21 We remain unconvinced by the State's argument that additional reasons included in the sentence pronouncement, such as Matt's lack of success with previous rehabilitative

9

efforts and the severity of the crime, absolve the court of impugning Matt's invocation of his constitutional rights at trial. Although those justifications comprised part of the reasons for sentencing, the sentence was tainted by the presiding judge prefacing the oral pronouncement of Matt's sentence by castigating him for wasting time and tax dollars by exercising his rights to a trial by jury, to remain silent, and to not incriminate himself. Our constitutional order relies on the preservation of these fundamental due process rights—regardless of past conduct of a defendant or volume of evidence presented by the prosecution. *State v. Lawrence*, 2016 MT 346, ¶ 10, 386 Mont. 86, 385 P.3d 968. Accordingly, Matt's sentence is vacated and this matter is remanded for resentencing before a new judge.

¶22 *Issue Two: Whether this Court should exercise plain error review to consider Matt's claim that alleged police misconduct violated his right to due process.*

¶23 Matt requests this Court exercise plain error review of the detention officers' conduct and reverse his conviction. He argues law enforcement conducted themselves outrageously by using physical force in response to Matt splashing water on Bundy and by restraining Matt instead of providing him with his medication.

¶24 "Plain error review is discretionary, and we apply it on a case-by-case basis." *Favel*, ¶ 13 (citation omitted). Plain error review is warranted in situations where, considering the totality of the circumstances of the case, the defendant has (1) demonstrated the "claimed error implicates a fundamental right and (2) firmly convinced this Court that the failure to review the claimed error would result in a manifest miscarriage of justice, leave unsettled

10

the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process." *Favel*, ¶ 23 (quotation omitted).

¶25 The doctrine of outrageous government conduct applies to "a situation in which the conduct of law enforcement is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction[.]" *U.S. v. Russell*, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 1643 (1973). This doctrine offers "a most narrow defense[,]" pursuant to which the defendant must demonstrate how the "alleged police misconduct violated the defendant's constitutional rights relating to the crime charged." *State v. Williams-Rusch*, 279 Mont. 437, 445, 928 P.2d 169, 174 (1996) (quotation omitted) (abrogated on other grounds *City of Billings v. Bruce*, 1998 MT 186, ¶ 47, 290 Mont. 148, 965 P.2d 866). The outrageous government conduct defense is limited to "extreme cases in which the government has essentially manufactured the crime or has generated new crimes merely for the sake of pressing criminal charges against the defendant." *Williams-Rusch*, 279 Mont. at 445, 928 P.2d at 174 (citations omitted).

¶26 In *Williams-Rusch*, the defendant challenged her conviction on the basis law enforcement viewing home videos depicting private sexual activity seized during an investigation into a marijuana grow operation constituted outrageous government conduct. *Williams-Rusch*, 279 Mont. at 446, 928 P.2d at 174. This Court refused to condone all aspects of law enforcement's "viewing and handling of the videos[,]" which included removing the video tapes to an officer's home, but agreed with the district court's determination that "it is not inappropriate for government agents to view home videos seized in the course of a drug raid to find evidence consistent with the crimes charged[.]"

11

*Williams-Rusch*, 279 Mont. at 446, 928 P.2d at 174. Thus, Williams-Rusch could not demonstrate government agents instigated the activity leading to her conviction for witness tampering, manufactured the crimes with which Williams-Rusch was charged, or generated new crimes purely to press additional charges against her. *Williams-Rusch*, 279 Mont. at 445-46, 928 P.2d at 174. Further, we noted "the appropriate remedy for [Williams-Rusch's] allegations of government misconduct in this case is not dismissal of the action," but rather "a federal civil rights action pursuant to 42 U.S.C. § 1983." *Williams-Rusch*, 279 Mont. at 446, 928 P.2d at 174.

¶27 Matt additionally cites *State v. LeMay*, 2011 MT 323, 363 Mont. 172, 266 P.3d 1278, to support his argument that his treatment in the custody of CSKT detention center staff shocks "the universal sense of justice[,]" thus meriting reversal of his conviction and dismissal of the charge against him. *LeMay*, ¶ 34 (citations omitted). There, LeMay asserted the case against him was tainted by racial profiling. *LeMay*, ¶ 32. Specifically, LeMay, a Native American, claimed law enforcement "harassed" him under the mistaken belief he was a white supremacist or participated in biker gangs due to his affinity for motorcycles. *LeMay*, ¶¶ 32, 34. We declined to reverse on outrageous government conduct grounds because LeMay failed to connect the two instances in which he was cited for riding his motorcycle while intoxicated to his claims of police misconduct. *LeMay*, ¶ 33. He likewise failed to prove that the alleged police misconduct violated his constitutional rights. *LeMay*, ¶ 33.

¶28 Here, Matt argues the refusal by CSKT detention center staff to provide him with his medication caused the physical confrontation for which he was then charged. However,

12

Matt likewise fails to connect his allegations of police misconduct to a violation of his rights or to demonstrate government complicity in his conduct. Our review of the record indicates Matt threw water in Bundy's face shortly before staff planned to administer the medication which Matt argues CSKT detention center staff denied him. The jury heard this evidence, were properly instructed, and did not accept Matt's version of events. The record establishes that Matt's conduct precipitated the disruption to his medication schedule. The record likewise indicates that, but for Matt escalating the situation by throwing water on Bundy, he would have received his medication at the regularly scheduled time. Detention center staff decided to secure Matt in the restraint chair and place a spit hood over him in *response* to his violent and self-harming behavior.

¶29 While Matt may have implicated his fundamental right to due process, ultimately Matt cannot demonstrate the existence of outrageous government conduct which violated his constitutional right to due process. Accordingly, we decline to exercise plain error review because we are not firmly convinced letting his conviction stand presents a manifest miscarriage of justice, leaves unsettled any question regarding the fundamental fairness of the trial, or otherwise compromises the integrity of the judicial process.

## CONCLUSION

¶30 The District Court's reasons for sentencing Matt infringed upon his due process rights by premising the sentence on Matt's exercise of his right to remain silent, his right against self-incrimination, and his right to a trial by jury. Accordingly, his sentence is vacated and this matter is remanded for resentencing before a different judge. Additionally,

13

we decline to exercise plain error review to consider Matt's claim of outrageous government conduct.

¶31    Affirmed in part, vacated and remanded in part.

/S/ LAURIE McKINNON

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ JIM RICE

Chief Justice Cory J. Swanson, concurring.

¶32    I concur in the Court's Opinion.  I write separately to comment upon the factors that a district court judge may well consider and express in this situation.  The sentencing policy of Montana is to:

> (a) punish each offender commensurate with the nature and degree of harm caused by the offense and to hold an offender accountable;
> (b) protect the public, reduce crime, and increase the public sense of safety by incarcerating violent offenders and serious repeat offenders;
> (c) provide restitution, reparation, and restoration to the victim of the offense; and
> (d) encourage and provide opportunities for the offender's self-improvement to provide rehabilitation and reintegration of offenders back into the community.

Section 46-18-101(2), MCA.

¶33    In this case, the District Court sentenced an individual who was convicted of a violent offense, and who the State sought to sentence as a persistent felony offender.  The court had the legal authority and likely the justification to sentence Matt to Montana State

14

Prison. In viewing Matt's demeanor, history of recidivism, lack of rehabilitation, and unsuccessful reintegration into the community from prior offenses, the court could have determined a prison sentence was necessary to protect the community. The court could have also assessed "[the] defendant's character and potential for future rehabilitation" when crafting a sentence, with the understanding that "is an issue separate and apart from guilt or innocence." *Rennaker*, ¶ 56 (Rice, J., concurring). And in appropriate circumstances, the court may consider the defendant's lack of remorse when sentencing, without punishing him for exercising his right to remain silent or asserting his innocence. *State v. Shreves*, 2002 MT 333, ¶¶ 21-22, 313 Mont. 252, 60 P.3d 991.

¶34 In other words, the District Court could have reached the same sentence based upon the above factors, without impermissibly expressing what amounts to punishing Matt for insisting upon his innocence and making the State prove its case. There is no such thing as an open and shut case. In all instances, the State must meet its burden of proof, and only the correct finder of fact (the jury unless the defendant waives a jury trial) can determine whether it has done so. *State v. Partain*, 2025 MT 83, ¶ 33, 421 Mont. 375, 567 P.3d 932 (citing *Rose v. Clark*, 478 U.S. 570, 578, 106 S. Ct. 3101, 3106 (1986); *State v. Porter*, No. DA 16-0251, Order (Mont. July 11, 2017) (defense counsel in a jury trial tactically conceded the defendant's guilt on one charge during her closing argument; State conceded on appeal it was error for the district court to direct a guilty verdict on that charge instead of sending it to the jury). For even the most straightforward case, the conviction is not a foregone conclusion. A witness may fail to appear or have a memory lapse, a juror may get sick, a key piece of evidence may be overlooked, or the jury may simply view the

15

evidence differently. Experienced trial counsel and judges may evaluate a case and quickly determine the likelihood of guilt or innocence, but the jury is the great leveler and ultimate decision-maker in our system. Liberty depends upon our devotion to this fundamental institution in deciding the fate of the accused, even if it is inefficient and time-consuming.

¶35     Our procedural guarantees are not in conflict with the sentencing policy and laws of Montana. A sentencing judge has the lawful authority to fashion and impose an appropriate sentence to safeguard the community and promote the offender's rehabilitation, when considering the permissible factors in reaching that determination. In this instance, the court erred, as others have in other instances. *See Rennaker*. I am confident the District Court is able to reassess the case upon consideration of this Opinion and impose a lawful sentence upon remand.

/S/ CORY J. SWANSON